## 𝕎ytheville.

### H. H. MURDEN v. VIRGINIA RAILWAY AND POWER COMPANY.

#### June 16, 1921.

1. DEMURRER TO THE EVIDENCE—*General Rule.*—By demurring to the evidence, the party demurring admits the truth of his adversary's evidence, unless it is inherently incredible or judicially known to be untrue, and all just inferences therefrom and waives all of his own evidence (although not in conflict with demurree's) not necessarily resulting therefrom. If several inferences may be drawn from the evidence, differing in probability, those most favorable to demurree must be adopted unless forced, strained or manifestly repugnant to reason.

2. DEMURRER TO THE EVIDENCE—*Contributory Negligence.*—Upon demurrer to the evidence, if the jury could have found from the evidence that the demurree was free from negligence contributing proximately to the causes of his injury, the court must so find.

3. CROSSINGS—*Duty to Look and Listen—Continuation of Duty.*— The duty to look and listen before crossing a railway track which is imposed upon travelers upon a highway continues as long as the occasion for the exercise of the duty continues, and if there was any point at which by looking and listening the person injured could have avoided the accident and he failed to do so, his contributory negligence defeats a recovery.

4. CROSSINGS—*Duty to Look and Listen—Case at Bar.*—In the instant case it appeared from plaintiff's evidence that when plaintiff went upon defendant's railroad track at a crossing the car which struck her must have been immediately at the crossing, though she sought to give the impression that it was not. Plaintiff claimed to have looked for a car before stepping on the track, but if she had done so there was nothing to hinder her from seeing the car that struck her.

*Held:* That plaintiff was guilty of contributory negligence.

Error to a judgment of the Circuit Court of Norfolk county in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Old & Brockenbrough* and *Jas. G. Martin,* for the plaintiff in error.

*Williams, Loyall & Tunstall,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is an action of trespass on the case to recover damages for injuries alleged to have been negligently inflicted by the Virginia Railway and Power Company, the defendant, at the intersection of Avenue B (a traveled road, or street, in the village of Ocean View, in the county of Norfolk), with the right of way and track of the defendant. After the evidence of the parties was submitted, the defendant demurred to the evidence, and the jury rendered a verdict for the plaintiff in the sum of $4,500, subject to this demurrer. Upon consideration thereof, the trial court sustained the demurrer, and entered judgment for the defendant, dismissing the action. The plaintiff brings error.

The accident occurred about half past ten, on the night of July 9, 1918. The plaintiff was returning to her home in Ocean View in an automobile containing several persons. She alighted from this vehicle at the intersection of Avenue B with Lynnhaven avenue (a much used thoroughfare), and the right of way of the defendant company. Ocean View is north of the city of Norfolk. The track of the Railway and Power Company runs along the western line, or edge, of the driveway of Lynnhaven avenue, also called Ocean View boulevard, and between this driveway and the paved sidewalk of the avenue, or boulevard. (For brevity this avenue will be hereinafter referred to as the boulevard.) This boulevard between the city of Norfolk and Ocean View was heavily traveled during the summertime,

Ocean View being a popular resort, with a summer population of something like five thousand people.

It will be noted that an automobile going from Ocean View to Norfolk would be on the right hand—that is, the western side—of the boulevard, and close to the track of the street car company. On the night in question, the plaintiff, an elderly woman of sixty-three years of age, a little sluggish in her movements from varicose veins and kidney trouble, but possessing her faculties of sight and hearing, was proceeding by automobile from Ocen View to Norfolk. The car stopped in B street on the boulevard, and the plaintiff alighted from the right hand side of same. This put her within a few steps of the railroad track. One of the occupants of the car, a daughter of Mrs. Murden, states that she saw her mother start in the direction of the railway crossing, but that she did not see her "cross it, as we drove off." The plaintiff had lived in Ocean View for seventeen years, and testifies that she had always been particular about using the crossing in question. Her statement in this connection is: "I got out there at B avenue, and she thought —it was half past ten o'clock at night—and we were coming from the View. She thought I was safe, and so did I. We had been so particular, and she said, 'Mama be particular.' She said, 'Don't you see that car coming?' and I would see it, and wouldn't cross. If they would blow the whistle to scare me, I wouldn't cross. Lots of people can testify that, who knew me, and who could testify it if they were here."

The plaintiff is evidently referring in the above statement to the conduct of herself and daughter, on occasions prior to the accident. Coming to the occurrences at the time of the accident and describing same, the plaintiff says in her examination in chief: "That night I looked down the track as far as I could see, and I didn't see any car at all, and didn't hear any whistle. As Mr. Martin says, there were automobiles on the boulevard; there were lights

there.  As I say, I didn't see the car at all.  If it had blowed, I wouldn't have crossed the track, if I had seen it.  I would have stayed on the other side, if it had been half way.  I started across, and after I got on the track, I saw two small lights that looked at least a square from me, if not more, and so I thought I was perfectly free to go across the street. The next I knew, my shoulder was almost killing me, and I knew that I had been struck by the car." ·

Further, on direct examination:

"Q.  Which side of the automobile did you get out?

"A.  The right hand side.

"Q.  What happened to you?

"A.  I looked down the track first, because I knew that there was no car at the View, and I looked towards Norfolk to see if there was a car, which I always do before I cross, and I didn't see any, and I got on the track, and these lights looked so small that I thought they were a square, and I knew I could cross before· the car got me.

"Q.  After you stepped from the automobile, how many steps was it to the railroad track?

"A.  I suppose two or three steps.  I do not know exactly."

The witness then states that the car did not blow any whistle, or ring any bell, on its approach to the crossing. ·

"Q.  How about the light you saw on the car?  Where was the car when you first saw any light on it? ·

"A.  It was right in the track, but I thought it was a square from me.

"Q.  You say there were two little lights; what do you mean by that?

"A.  They looked about that size (indicating) ; I didn't see any large light at all.

### *Cross-Examination.*

"Q.  You use the crossing very often?

"A.  Yes.

\*      \*      \*      \*      \*      \*      \*      \*

"Q.  As I understand it, when you got out of the automobile you then looked up the track?

"A.  Yes, sir.

"Q.  And you did not see any car?

"A.  I did not see any car.

"Q.  Was there anything to stop you from seeing one, if there had been one there?

"A.  No, sir.

"Q.  There was nothing to stop you from seeing one, if there had been one there?

"A.  No, sir.

"Q.  How far were you from the track then?

"A.  Just so far enough so the car would not have struck me, if one had passed.

"Q.  How far was that?

"A.  About two feet.

"Q.  I do not think you understand.

"A.  I say I think I was about two feet.  I never go up to the track until I look to see if one is coming.

"Q.  I do not think I understand your answer.  Let me state the question.  I thought you said you looked when you first got out of the automobile?

"A.  I did, before I got on the track.  .

"Q.  Did you look again before you got on the track?

"A.  Yes, sir.

"Q.  At that time you were about two feet from it?

"A.  Yes, sir.

"Q.  And there was nothing to stop you from seeing it, if it had been there?

"A.  No, sir.

"Q. Then you looked again when you were on the track?

"A. Yes, sir.

"Q. Where were you then? Were you about the center the track?

"A. I think I was about the edge. I don't think I was in the center.

"Q. But you were between the rails?

"A. Yes, sir.

"Q. Then you saw these two lights?

"A. Yes, sir.

"Q. The last time you had looked before that, you were two feet from the track?

"A. Yes; sir.

"Q. And there was nothing to stop you from seeing the car, if it had been there?

"A. No, sir.

"Q. Are you quite sure of that?

"A. There were automobiles in the boulevard.

"Q. But they were not right alongside?

"A. No.

"Q. I meant at this time when you were in two feet of the boulevard, there was nothing to stop you from seeing the car, if it had been there?

"A. No, sir.

"Q. That is correct, is it?

"A. Yes, sir.

"Q. You are sure of that?

"A. Yes, sir.

"Q. Positive?

"A. Yes, sir.

### *Re-Direct.*

"Q. Do automobiles run down Lynnhaven avenue in the same direction as the street car, and close to the street car?

"A. Yes, sir.

Opinion.

"Q.  What effect does that have upon any person looking up towards Norfolk?

"A.  I don't know that it would have any effect on me, if I had seen the car, because I would certainly have known the car from the automobile.  They must have been coming rapidly, as they often do.

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

"Q.  Could you tell a regular street car light from an automobile light?

"A  Yes, sir."

The plaintiff made a statement in writing, giving the circumstances of the accident, shortly after she was injured. This statement, which was made to an agent of the company, was introduced before the jury by counsel for the plaintiff.  In some material respects this statement conflicts with the testimony of the plaintiff given on the stand.  The following is taken from this statement:

"I was in an auto with my daughter, coming from Ocean View, it stopped at B avenue, and I got out and started to cross the car track.  I did not see, or hear, any car approaching until I got about in the middle of the track, at which time I saw the lights of a street car coming from Norfolk.  The car was very close.  As I was in the center of the track, I decided to try to make it across the track to the west side, but car was so close it struck me before I could get clear of the track.  I did not hesitate or stop on the track at all, it seemed to me the car stopped almost immediately after I was struck.  I did not see the car before I went on the track, and if I had, I would not have tried to go across."

"Q.  (By Mr. Martin).  Where were you when you signed that statement?

"A. He didn't write all of this like I told him, because I told him I thought the car was at least a square from me, if I hadn't, I would not have crossed the track.

"Q. By Mr. Tunstall: I beg your pardon.

"A. I told Mr. Brockmyer the car was, I thought, at least a square from me, or I would not have crossed the track.

"Q. At what point of your vision, before you went on the track, or after you went on the track?

"A. Before I went on the track.

"Q. You saw the car then, and thought it was at least a square away?

"A. I didn't see the car then.

"Q. Then what do you mean?

"A. (Interposing) Mr. Martin read I said the car was very near me, but I told him (*i. e.*, Brockmyer) I thought it was at least a square from me, after I saw it.

"Q. And you did not see it until you got struck?

"A. No.

"By Mr. Martin (referring to when she gave the statement) :

"Q. What was your condition?

"A. I was suffering terribly, but I was in my right mind. * * * *"

This concludes the plaintiff's own testimony as to the circumstances of the accident, and there is but little evidence on the subject by the other witnesses.

The husband was sitting on his porch that night, awaiting the arrival of his wife. With him was a Mrs. Nolan. The porch was about 125 feet from the place of the accident. The husband states that he did not hear the car whistle as it approached the crossing. On cross-examination he stated that the car track from B avenue back towards Norfolk was straight for half a mile. Mrs. Nolan

states that she saw the car "give a sudden slow up, and then it stopped about 120 feet away."

A Miss Evans, who was in the automobile with Mrs. Murden's daughter, states that the auto moved off, after Mrs Murden descended at B street, but she did not see any street car, or hear any bell, or whistle. Mrs. Everett, another passenger in the automobile, states that she did not hear the street car sound a whistle, or ring a bell. Mrs. Evans, the daughter of Mrs. Murden, who was driving the car, states that after she left her mother at the crossing she did not hear any whistle, or gong, to indicate that a car was coming, or see any car.

The street car company did not introduce any evidence.

It will be noted that neither Miss Evans, Mrs. Everett, nor Mrs. Murden states that she was looking or listening for the approach of a car. They simply testify that they did not hear or see one.

[1-2] The law governing courts when considering a case on demurrer has been repeatedly stated.

"By demurring to the evidence, the party demurring admits the truth of his adversary's evidence, and all just inferences therefrom and waives all of his own evidence in conflict therewith, and also all inferences from his own evidence (although not in conflict with demuree's) not necessarily resulting therefrom." *Wood* v. *Phillips,* 117 Va. 878, 86 S. E. 101.

"When the consideration of the evidence is taken from the jury by a demurrer to the evidence, if the jury could have found therefrom that the demurree was free from negligence proximately contributing to the causes of injury complained of, the court must so find." *Higgins* v. *Southern Ry. Co.,* 116 Va. 890, 83 S. E. 380.

"Upon demurrer to the evidence, the testimony of witnesses for the demurree must be accepted as true, unless inherently incredible, or judicially known to be untrue; and

if several inferences may be drawn from the evidence, differing in probability, those most favorable to demurree must be drawn, unless forced, strained, or manifestly repugnant to reason." *Wolonter* v. *Casualty Co.*, 126 Va. 156, 101 S. E. 58.

To the same effect see *Parrish & Co.* v. *Pulley*, 126 Va. 319, 101 S. E. 236.

According to the evidence given by the plaintiff, she was accustomed to look before crossing the railroad tracks, and did look on the night in question, first when she got out of the automobile, and again before she got on the track, when she was about two feet from same. On neither occasion did she see any car. Thereupon, she stepped upon the track, and when she was "about the edge," she looked again, and saw two small lights that she judged were about a square away. Thinking she had time to cross to the other side, she continued to go forward, and "the next she knew, she had been struck by the car."

She is emphatic that when she first saw the two small lights, "she was right in the track, but thought they were a square from me."

There is a conflict between the witness' statement given immediately after the accident, and her testimony on the stand. In her statement on the stand, she is positive that she looked before stepping on the track, and that she was at the edge of the track when she saw the two small lights. In her statement she says: "I did not see, or hear, any car approaching until I got about the middle of the track, at which time I saw the lights from the street car coming from Norfolk, the car was very close, as I was in the center of the track, I decided to make it across the track to the west side, but car was so close it struck me before I could get clear of the track. I did not hesitate or stop on the track. I did not see car before I went on the track, and if I had, I would not have tried to go across." When on the stand she

corrects one item in this statement, stating that she told the person taking it down (Mr. Brockmyer, an agent of the railroad), that she thought the car was at least a square from her, and that he had not written it down "like she told him." In other respects, she apparently accepts the statement as correctly giving her statements to Mr. Brockmyer. She also stated to counsel for the company, on cross-examination, that she saw the car before she went on the track, and thought it was a square away, but this statement she immediately corrects, stating that she did not see the car until she was struck, meaning doubtless just before she was struck. The witness also states on cross-examination, with emphasis, that there was nothing to hinder her from seeing the car when she looked, if one had been there, and that when she last looked, she was so near the track, that she was "Just so far enough so the car would not have struck me if one had passed." Now, it must be apparent that whatever the witnesses may say about not seeing, or hearing, a car at the crossing immediately prior to the accident, the car physically must have been there, and even if it was not carrying lights, could have been seen on a track that was straight for half a mile from the crossing. The plaintiff looked towards Norfolk when she was just at the rail, a step and she was inside the rail, the little lights flared out, and in a moment, before she could take the few steps that would have placed her across the other rail, and in safety, she was struck. In her statement, given immediately after the accident, she says that she was in the middle of the track when the lights appeared but apparently a square away, according to the corrected version on the stand. Though she did not hesitate, or stop on the track, she was struck before she could cross the second rail. All of this shows that when she went upon the track, the car must have been immediately at the crossing, though the impression she seeks to give is that it was not.

"There was nothing," she stated on cross-examination, repeating the statement several times, "to stop me from seeing a car, if there had been one there." This looking on her part was just prior to her entrance upon the track. The distance between the rails of a street car track is only a few feet. Starting from the rail on the west side of Lynnhaven avenue, and a few steps, requiring a second or two, even for an elderly lady, would carry one clear across the track. There is no evidence that it was a dark night, such a night for instance as was established in *Shively* v. *N. etc., R. Co.*, 125 Va. 384, 9 S. E. 650, by witnesses who said that they could not see ten feet ahead of them on account of the fog. The petition contends that the court should draw the inference "that just before striking the plaintiff, the motorman seeing her, turned on two little lights, having no headlight." But if the night was clear enough to enable the motorman to see so small an object as a person on the track, and seeing her, turn on his little lights, there must have been sufficient light to enable a person at the crossing, carefully looking up a straight track, to see so large an object as an approaching street car, even if running with no lights showing. Moreover, if it was running very rapidly, as suggested by the plaintiff in her testimony, the noise of its approach to any one standing just at the track, and looking in that direction, would have been noticeable, whether or not the person who was looking, was making any special effort to hear. If the car was traveling at the rate of thirty miles an hour, it was making forty-four feet a second. According to plaintiff's statement, she must have been struck within a second or two after she last looked from a point outside of, but immediately at, the rail. She looked, saw nothing, stepped inside of the rail, looked again, saw the little lights, and almost immediately was knocked down. Upon the hypothesis that she was struck one second after she looked, conceding a speed of thirty miles an hour for the car

then the car was only forty-four feet away from the crossing when she last looked and, as she states, saw no car. At that distance it must have been plainly visible. If she was struck two seconds after she looked, then when she looked the car was eighty-eight feet away, and could have been seen. Just in proportion as the interval of time between the turning on of the lights, and the actual injury, is reduced, the distance of the car from the crossing, at the time the plaintiff alleges that she last looked, is diminished, thereby increasing the likelihood that the car could have been seen as it approached, and enhancing the improbability of the plaintiff's statement that although she looked and there was nothing to hinder her from seeing the car, if one had been there, she did not see one.

Manifestly, the car was there, on the track and approaching, for within a period of time that, at the most, according to plaintiff's testimony, was a second or two, it was upon her. Place the car at whatever distance you choose from the crossing at the time the plaintiff stepped inside of the rail, then if it is claimed that there was light enough to enable the motorman to see her, and, apprehending her danger, to turn on the lights, as suggested by plaintiff in error, it is obvious that a moment sooner there was light enough to enable one at the rail, and looking towards Norfolk along a straight track, to see the car as it approached. If there was no car when the plaintiff looked, just outside of the rail, and a second or two later she was knocked down by a car, it may be well asked whence, and how, did that car materialize?

[3] "The duty to look and listen before crossing a railway track, which is imposed upon travelers upon a highway, continues as long as the occasion for the exercise of such duty continues, and if there is any point at which by looking and listening the person injured could have avoided the accident and he failed to do so, his contributory negligence de-

feats a recovery." *Springs* v. *Va. Ry. & Power Co.*, 117 Va. 826, 86 S. E. 65.

[4] Conceding the negligence of the railway company, it must be apparent from the evidence for the plaintiff, viewed as we must view it under the rules that fix our attitude and determine our powers upon a demurrer to the evidence, that she was guilty of contributory negligence in respect of the injuries that she suffered. Hence, there was no error in the action of the trial court sustaining the defendant's demurrer, and its judgment is affirmed.

*Affirmed.*

SIMS, J., dissenting:

I find myself unable to concur in the majority opinion in this case.

It is plain that the plaintiff was guilty of no contributory negligence after she got upon the railway track. She did not see the small lights displayed in front of the street car, in lieu of the large head-light it was accustomed to display, and realize that a street car was near her until she was in the center of the track. That she then, under the circumstances, consisting of the night time, the small lights directly facing her, and the street car approaching in a direct line towards her, incorrectly estimated the distance the street car was away, and "thought it was a square away," is surely not negligence *per se.* It is difficult, even in broad daylight, to estimate the distance one is away from a moving object approaching in a straight line. And at any time, unless the intervening space is well lighted so as to be measured by the eye, it is impossible for one to estimate such distance with any degree of accuracy. And certainly the plaintiff's conduct, in not hesitating or turning back, or stopping on the track, but attempting to get off by proceeding on her way in the same direction as that in which

she was then moving, at a speed which she thought was ample to enable her to escape, was not contributory negligence *per se.*

Nor can I think that the failure of the plaintiff to see the street car before she went on the track was negligence *per se.* In view of the circumstances, that it was as late as half past ten o'clock at night, when on demurrer to the evidence we must at least infer that there was considerable darkness; that the plaintiff had the right to assume that if a street car was approaching it would carry its usual large headlight, and would give proper signals; that the street car gave no warning signal; that it had no large headlight; that automobiles were at the time running "down Lynnhaven avenue in the same direction as the street car and close to the street car" with lights similar to those which the street car chanced to use that night, rendered the failure of the plaintiff to distinguish the street car from an approaching automobile, and to recognize that it was a street car sooner than she did, a thing which was but reasonably to be expected to occur in the conduct of any reasonably prudent person under the circumstances. Certainly, as it seems to me, the conduct of the plaintiff in failing to see and recognize the approaching street car as a street car before she went on the track cannot be said to be negligence *per se,* as it is held to be in the majority opinion. To say the least of it, reasonable men would not all agree that such conduct evidenced the failure of the plaintiff to exercise reasonable care under the circumstances. Hence, whether the plaintiff's conduct constituted contributory negligence was, under the facts of this case, a jury question, which on demurrer to the evidence by the defendant should be resolved, as I think, in favor of the plaintiff.