# Richmond

## NORFOLK AND WESTERN RAILWAY COMPANY v. W. R. ELEY.

January 14, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*F. M. Rivinus, W. Moncure Gravatt, L. P. Holland* and *James H. Corbitt*, for the plaintiff in error.

*W. H. Venable, Holland & Lovelace* and *John N. Sebrell*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

In this case the plaintiff, W. R. Eley, recovered a verdict and judgment for $1,000.00 against the defendant railway company. It rests upon injuries to himself and damages to his automobile suffered at a public crossing.

Myrtle is an inconsiderable station on the main line of the Norfolk and Western Railway, a short distance west from Suffolk. A county road, running practically north and south, crosses there this railway right of way at an angle of something like sixty-two degrees. In the southeast corner, or just south of the railroad and just east of the county road, is a small freight and passenger station. Immediately in front of it are three tracks, first the westbound, then a passing track and then the eastbound. Immediately in its rear runs a station siding.

On the night of November 7, 1926, the plaintiff, an unmarried farmer, twenty-two years old, alone in a closed Buick automobile going south on this road, was struck by a westbound freight train, made up of a heavy freight engine

and about sixty cars. His automobile was carried something over 1,200 feet before the train was stopped. It was demolished. His injuries at first seemed inconsequential but it is claimed that they were in fact serious as was shown by subsequent developments.

There was a heavy fog and because of it Eley said that he stopped his car and put his head out of the window on its left hand side, the side from which the train came, to look and listen, and continued to so look and listen as he approached the crossing. He further stated that after this stop he ran slowly in second gear and at an estimated speed of about five miles an hour. In undertaking to locate the point at which he stopped he first said that it was about fifty feet from the main line and then that it was fifty or sixty feet from the station siding, which put him about ninety feet from the main line. He last said that he stopped about twenty feet from this side track, thus in substance confirming his first statement. At none of the points named was there anything to prevent him from seeing the approaching train except the fog. The track itself is straight and runs on an embankment about five feet high and is reached on a six per cent grade. The county road is not paved but this grade seems to have been covered by small rocks or cinders, making what may be described as an imperfect macadam. He himself was intimately acquainted with the situation there. It was near his home.

His evidence is that when twelve or fourteen feet from the middle or passing track he saw standing on it a freight train. To avoid collision he turned to his right along the westbound main track, then put on his brakes, stopped his car within a short distance, and undertook to reverse gears, but one of its wheels hung on a rail and in a moment he was struck. He never saw or heard the train which hit him.

Questioned as to why he continued to go forward in the fog, he said:

"Q. If it was so foggy you couldn't see it, why was it, instead of driving up on the crossing and taking the risk when you knew you couldn't see, why didn't you get out of your car and go up on the crossing to look?

"A. I have been up there lots of times and I didn't think it necessary.

"Q. But you tell the jury you couldn't see because of the fog, and knowing you couldn't see because of the fog, why didn't you stop and investigate more closely before going across?

"A. I didn't think it was necessary.

"Q. In other words, you were willing, although you knew you couldn't see because of the fog, to take your chances to go across?

"A. I didn't see anything and I didn't think there was any harm or danger from it."

The train which did the damage, a fast freight, followed from Lambert's Point and was passing at Myrtle that train which stood upon the siding. When about two miles from Myrtle it came upon a semaphore or yellow board, which was a caution signal, and went forward slowly. Next seen was a red signal, which in this case indicated that the forward train was crossing over to the siding track. This signal changed to green which showed that movement to have been completed. That was three quarters of a mile from Myrtle. At this point this following train, which had stopped, began to pick up speed. The engine's exhaust was opened up and it was running at the rate of about twenty miles an hour at the moment of impact. The engineer testified that a headlight could be seen there forty or fifty car lengths away. The brakeman said it could have been seen for half a mile. Of course the distance at which a light makes objects visible is wholly different from that at which the light itself can be seen. This much must be conceded. The fog was not so thick as to obscure block lights and the

electric headlight of an engine is many times more powerful than they. If plaintiff stopped fifty or ninety feet from the main line track and thereafter ran at the rate of about five miles an hour, the train which was gathering speed and was running twenty miles an hour at the crossing, was then somewhere between 200 and 360 feet away, and could have been seen. The fog was then thin enough for Mr. Atkins, whose house was 130 or 140 feet away, to see the headlights from this automobile flash into his room, and the car then appeared to be moving rapidly.

If it be said that this conflict in evidence was settled by the jury's verdict, that claim is answered in two ways. The jury did not necessarily find that the plaintiff was without negligence. It may have believed that he was negligent and yet have found for him under the doctrine of comparative negligence, and this would seem to be the case, for its verdict was for but $1,000.00, when the automobile destroyed was worth that alone. If we are to believe that the fog was so dense as to make it impossible to see at all, then extraordinary vigilance was required of Eley. He should not have undertaken to pass over a much used main line track in an impenetrable fog without first satisfying himself that he could do so with safety.

"The greater the danger at a particular crossing, the greater the vigilance required of both. Before crossing a railroad, the traveler on the public highway must use his sense of sight and hearing. He must approach the crossing carefully, and must look in every direction that the rails run to make sure that the crossing is safe; and his failure to do so will, as a general rule, be deemed negligence. Moreover, since the track is a proclamation of danger to the traveler, he must not only use his eyes and ears, looking and listening in both directions, but he must make the acts of looking and listening reasonably effective." *Smith's Adm'r v. Norfolk & W. R. Co.*, 107 Va. 725, 60 S. E. 56, 57.

The duty to exercise due care rests as imperatively upon the traveler as it does upon the railway, and in applying this rule it must be remembered that trains must run upon their tracks while no such steel-bound limitation confines the traveler. One must intelligently use both eyes and ears.

" 'This court has repeatedly held that the duty of looking and listening for approaching trains before crossing a railroad track must be discharged in a way to make looking and listening effectual.'. *U. S. Spruce Lumber Co.* v. *Shumate*, 118 Va. 471, 87 S. E. 723; *Southern Railway Company* v. *Jones*, 106 Va. 412, 56 S. E. 155; *Murden* v. *Virginia Railway and Power Company*, 130 Va. 449, 107 S. E. 660." *Hancock* v. *N. & W. Ry. Co.*, 149 Va. 829, 141 S. E. 849, 851.

If Eley had been blind, the noise of this approaching train should have warned him. The night was still, his head was out of his car window to look and listen from the time when the train was probably not more than 300 or 400 feet away, and thus with his faculties alert he went towards and upon the track. It was a heavy freight train, gathering speed with its exhaust open. Common knowledge tells us of its noise. *Chicago & N. W. Ry. Co.* v. *Andrews* (C. C. A., 8th Circuit), 130 F. 65.

In *Norfolk & W. R. Co.* v. *Crowe's Adm'x*, 110 Va. 798, 67 S. E. 518, 520, the court said: "It is proven also, and without contradiction, that an engine pulling a train of heavy cars, as the train in question was, composed of a baggage car, one ordinary coach and three Pullman sleepers, must of necessity make quite an exhaust in performing its work, especially on an up-grade; and the engineer that ran this train says that the engine was laboring quite heavily, and his statement is not only not contradicted but borne out by plaintiff's witnesses, Mr. and Mrs. Bishop, the latter saying that the train was making more than the

usual noise. Now, to accept as true the statement of the witness, Rutledge, upon which the verdict of the jury can alone be sanctioned, that he and his companion, the deceased, although they had both at twenty-five feet from the railroad track and again at the crossing, looked and listened for an approaching train and neither saw nor heard the train coming, although neither the sight nor the noise made by the train was obstructed, would, under the circumstances narrated, be to accept as true that which in the nature of things could not be true." See also *Atlantic Coast Line R. Co.* v. *McLeod* (C. C. A. 4th Cir.) 11 F. (2d) 22.

Courts cannot accept as true statements which, if made out of court, no one would believe.

Having reached the conclusion that plaintiff was himself guilty of negligence we are to determine if he can, notwithstanding that conclusion, recover upon the doctrine of comparative negligence. Code section 3959.

In Code section 3958 it is provided that the whistle shall be sharply sounded at least twice when the train is not more than 600 yards nor less than 300 yards from the crossing, and that the bell shall be rung or whistle sounded continuously or alternately until the crossing has been reached.

The evidence for the railroad, if believed, is ample to show that both the whistle was sounded and the bell rung. Under the rules of the road the bell must be rung continuously when passing trains on sidings. The bell in this instance was an automatic one and had been turned on as required for the train on the siding track long before the crossing was reached, and it is certain that it was ringing when the train stopped after the accident 1,200 or 1,300 feet below the crossing. When Eley stopped to listen for this train, according to his testimony, it was not over 300 or 400 feet from the crossing. From this it is plain that it

may have already given every signal whistle required. Before stopping he does not claim to have either looked or listened. How can the statement that he afterwards continued to look and listen be true when he never saw or heard the train which struck him?

At the second trial this evidence given by him at the first trial was read to him and not contradicted.

"Q. How far did the car skid in making that turn?

"A. I don't know sir. I never measured.

"Q. You know it skidded there? You felt it skid?

"A. I couldn't say I did.

"Q. You couldn't say you didn't?

"A. I don't remember it skidding.

"Q. You don't remember anything about it, do you?

"A. No, sir; I don't.

"Q. You don't know whether it skidded or not, do you?

"A. No, sir; I don't."

Dempsey Johnson, a witness for the plaintiff, on cross-examination, said that he went to the scene of the accident next day about twelve o'clock and saw on the grade going up the railroad track marks eight or ten feet long, which seemed to have been made by dragging wheels. He did not try to trace them to the point where the car was when hit.

John L. Holmes, assistant train master for the defendant company, whose station is at Crew, went to the point of the accident and reached there about 8:30 the next morning. He said:

"Q. Describe the conditions.

"A. A few feet, eight or ten feet, south of the station I could see where an automobile had skidded, and it continued to skid until it passed over the westbound main track and off the roadway some four or five feet. I followed that same track along the westbound main track and could see where the wheels kicked ties clear up to where the damaged automobile was off the main track. The same marks I seen I followed."

C. D. Hallar, who had at one time worked for the Norfolk and Western Railroad as a claim agent, but who was retired on the 23rd of January, 1929, reached Myrtle between 6:30 and 6:45 on the following morning, and testifying as to conditions at the crossing, he said:

"A. It was good, all filled in with small crushed stone, a splendid crossing. Then I went on the other side and I saw where a machine had started skidding after it had crossed what we call the house track. You call it the siding. It runs around behind the station. It skidded right up through this soft crushed stone until a part of the car went over into the space between the westbound track and the middle track. The left hand wheels of the car were next to the ties.

"Q. Of which track?

"A. Of the middle track; and the other wheels were over in the edge of the westbound track, and where it went up, following the westbound track, it took out the slag that way, like the wheels had been thrown around, or something of that kind, which caused it to do it, and I suppose it went through that slag about ten or twelve feet.

"Q. Do you mean it came up?

"A. I mean it ran up parallel with the ties of the track ten or twelve feet."

█ In the light of these uncontradicted physical facts how can we believe that Eley approached this right of way slowly and at about five miles an hour, looking and listening with care; that he did not apply his brakes at all until he had reached the westbound track and had turned westward to avoid striking the train standing upon the passing track; and that during all of this time he knew nothing of the approaching train although he was alert and listening? Had he been listening at all he would have heard it whether the bell was ringing or not. The conclusion that he was

running rapidly and that he neither looked nor listened is unavoidable.

 The only other witness who testified as to signals of approach is Mr. Johnson. His home is ninety or one hundred yards from the right of way and the bedroom in which he was sleeping is on the far side of the house from it. He went to sleep around eight or nine o'clock but woke up in the night five or ten minutes before he heard some train come in. This train so heard was one of two trains then at Myrtle, but from it he heard no whistle. He did hear what seemed to him to be the jamming of cars due to the application of the emergency brake.. All of this was at eleven o'clock, he was certain of the hour because he looked at his clock. The accident in judgment happened at 11:50 o'clock. He further testified that it was nothing unusual for two trains to be at Myrtle at once. In the course of an examination he was questioned by a juryman and gave these answers:

"Q. You don't swear it didn't blow?

"A. No, sir; I didn't hear it and I don't see what there was to keep me from hearing it with my house that close."

\* \* \* \* \*

"Q. Mr. Johnson, do you notice the trains and hear them blow when you are at home?

"A. Most of the time I hear them.

"Q. Would you say practically every train that passes there you hear it blow?

"A. No, sir.

"Q. I suppose every train that passes there is supposed to blow?·

"A. Yes, they are supposed to, but that was one that didn't blow.

"Q. Did you say you ordinarily would hear every train or pay attention to the whistle of the train as it was coming up there?

"A. Yes, sir; ordinarily.

"Q. You could hear it?

"A. I don't notice it probably.

"Q. Did you notice it particularly that night you didn't hear it?

"A. I don't remember.

"Q. You don't remember hearing it blow?

"A. No, sir; I didn't hear it blow."

This testimony is negative and without probative value. *White* v. *Southern Ry. Co.*, 151 Va. 302, 144 S. E. 424; *Cooper* v. *Southern Ry. Co.*, 153 Va. 93, 149 S. E. 444.

Before any recovery could be had in this case negligence of the defendant must be shown, which is but to say in another way that the burden is on Eley to show that the defendant railway company failed to give statutory crossing signals. This he has not done.

For reasons given we are of opinion that the judgment of the court below should be reversed, judgment entered here for the defendant and the case dismissed. It is so ordered.

*Reversed.*

CAMPBELL, C. J., and HUDGINS, J., dissenting.