# Richmond

ATLANTIC COAST LINE RAILROAD CO. v. EDRIE BOWEN.

March 12, 1951.

Record No. 3751.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Denny, Valentine & Davenport* and *J. M. Townsend,* for the plaintiff in error.

*Sands, Marks & Sands,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

On January 22, 1947, about 4:00 o'clock p. m., an Oldsmobile sedan, owned and driven by J. C. Sheffield, was struck by a train of the Atlantic Coast Line Railroad Company, plaintiff in error, at a grade crossing on U. S. Route 60 near the city of

Richmond, Virginia. The driver and Edrie Bowen, an occupant of the car, were injured and the automobile almost demolished.

From a verdict and judgment awarded defendant in error, Edrie Bowen, for damages she sustained, this writ of error was granted.

In addition to the driver and Edrie Bowen, the car was occupied by the latter's daughter, Jeanelle Bowen, and the driver's mother. They were all strangers in this vicinity and were en route to New York from Tupelo, Mississippi. They had started the previous afternoon about 4:00 p. m. and by three of them alternating as chauffeur, had driven without stopping except for meals and short periods of rest.

At the point of the mishap the highway extends in an easterly and westerly direction and over it there is much vehicular travel. The automobile was proceeding eastwardly toward Richmond. The railroad, which consists of two tracks, one for northbound trains and the other for southbound, runs generally in a northerly and southerly direction and crosses the highway at almost a right angle. The train was proceeding northwardly along the east track. It consisted of a diesel engine drawing freight cars and was traveling about twenty-five to thirty miles per hour.

Westwardly from the crossing the highway is straight and practically level for a considerable distance. In that direction two hundred and twelve feet from the northbound track and on the right (south) side of the highway, the Virginia State Highway Department maintained a round sign with the letters ''RR'' upon it, and about one hundred and fifty-eight feet from that track, plaintiff in error maintained a white sign with black cross marks and the words ''Slow Down 5 Miles—Va. Law'' thereon. (Sec. 56-407, Code, 1950.) Under this lettering and written vertically on the post supporting the sign appear the letters and word ''RR Crossing''. Located thirty-three feet westwardly from the center of the northbound track on the south side of the highway is an automatic semaphore signal device also maintained by the company. It is equipped with a paddle upon which is written ''Stop''. The normal position of this paddle is upright and the device is operated by a track relay one-half mile south of the crossing. When a train approaching the highway arrives at that point, the relay (electrical

circuit) is broken and the paddle falls to a horizontal position and the word "Stop" appears thereon in red letters. Immediately after this collision the paddle was found in a horizontal position.

The semaphore signal (horizontal paddle) was located fourteen feet from the ground. There was testimony that it was too high to be seen from a closed automobile distant therefrom twenty feet or less and that it could not be easily seen from a distance of forty feet by one seated in such a car. It was also shown that the Virginia State Highway Department had considered this signal device inadequate to give the necessary warning to the traveling public at this location. It had during 1944 and at times subsequent suggested to the railroad company that the flashing light type of signal situated eight to ten feet above the tracks and generally used at such grade crossings be substituted therefor, but to no avail.

No sign commonly known as the "crossbuck" which bears the words, "Railroad Crossing" thereon was maintained as required by section 56-406, Code, 1950. That section, among other things, provides as follows:

"Every railroad company shall cause signal boards, well supported by posts or otherwise, at such heights as to be easily seen by travelers, and not obstructing travel, containing on each side, in capital letters, at least five inches high, the following inscription: 'railroad crossing', * * * to be placed, and constantly maintained, at each public highway where it is crossed by the railroad at the same level * * * so as to be clearly discernible to travelers approaching the railroad crossing from each direction at a distance of two hundred feet away; * * *."

The day was clear and cold and the road dry. Skid marks ninety to one hundred feet long made by this car were found on the highway. They began on the southern half of the road and curved slightly to the north until they were about in the center of the highway when they reached the tracks, thus indicating where the automobile came in contact with the engine. The most westerly thirty to thirty-five feet of the skid marks were quite light, but the other two-thirds or thereabouts nearest the crossing were very dark.

The testimony disclosed and it is uncontradicted that as the train approached the crossing, its whistle and bell were sounded in compliance with the statutory requirement. (Section 56-414,

Code, 1950.) After the collision, the windows of the car were proved to have been closed.

Only three witnesses to the accident testified. They were the engineer and brakeman, who were seated in the engine when the collision took place, and Jeanelle Bowen. The two members of the train crew first saw the automobile only a second or so before the collision and it was then within a few feet of the track. Defendant in error, who was seated in the rear, was asleep and did not see the train. Her daughter, who was on the front seat, had been asleep but awakened when the automobile was about two car lengths from the track and thus obtained but a momentary view of the train before the mishap. Neither J. C. Sheffield nor his mother appeared at the trial though unsuccessful efforts were made by defendant in error to obtain Sheffield's deposition in Mississippi. Thus there is no evidence as to what the driver was doing or saw as he approached the crossing except that indicated by the skid marks on the highway.

The case was submitted to the jury upon the primary issue of whether or not the company had been guilty of negligence which was a proximate cause of the mishap.

Over the objection of plaintiff in error the following instruction No. 3 was given:

"The Court instructs the jury that it is the duty of a railroad to provide adequate warning signals at dangerous railroad crossings. If, therefore, you believe from the evidence that this was a dangerous crossing, then the defendant railroad company had a duty to provide warning signals for the protection of travelers and to see that such signals were adequate. If, therefore, you believe under the evidence that this crossing was a dangerous crossing, then such signals were required at the crossing here involved, and if you believe that as maintained the semaphore light signal at this crossing was improperly located, difficult to see by a traveler over the highway using reasonable and proper care, or in any other wise inadequate to give timely warning of the presence of the crossing, then the defendant railroad company was guilty of negligence as to its maintenance."

The company contends that it was guilty of no negligence that proximately caused or efficiently contributed to the collision. It admits that under the holding in *Ivory Storage Co.* v. *Atlantic Coast Line R. Co.,* 187 Va. 857, 48 S. E. (2d) 242, it was negligent in failing to maintain the statutory crossbuck sign, but earnestly

asserts that such omission was not a cause of the collision. That, it says, was solely due to the negligence of Sheffield. The company also admits that there was evidence to the effect that the semaphore signal device maintained by it was inadequate to warn the traveling public of the approach of trains, but it contends that this has not been proved to be a dangerous crossing or attended with any unusual hazard, and therefore, it was under no duty to maintain that or a more adequate signal device. *Norfolk, etc., Ry. Co.* v. *Wilkes,* 137 Va. 302, 119 S. E. 122; *Atlantic Coast Line R. Co.* v. *Clements,* 184 Va. 656, 36 S. E. (2d) 553; 44 Am. Jur., ''Railroads'', sec. 520, p. 764.

In this respect it is also claimed that even if the semaphore signal was inadequate, that was not a proximate cause of the collision. *Virginian Ry. Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776, and *Southern Ry. Co.* v. *Berry,* 172 Va. 266, 1 S. E. (2d) 261.

It is said that the purpose of the crossbuck sign is to give warning of the presence of the railroad track, and the purpose of the semaphore to warn of an oncoming train. With that we can agree. Yet, just inferences from the existence of the skid marks indicate that with the crossbuck sign absent, the driver in some way became aware of the existence of the track when some one hundred feet distant. However, it does not necessarily follow that when 90 to 100 feet away or when somewhat closer where the skid marks were still very light, he was then aware that a train was approaching, as insisted by the company. A fair and reasonable inference that the jury might have drawn was that he first became aware of the track and touched his brake and then later when apprised of the train and its dangerous proximity, the brakes were more forcibly applied and thus the light and heavy skid marks resulted. It is rather certain that when about 100 feet from the crossing, he was apprised of the existence of the track; but not necessarily the train. Without the warning crossbuck sign or a semaphore device deemed adequate for such a crossing, it appears that he did not discover the approaching train until the peril was imminent and the collision unavoidable.

We do not think it beyond the realm of reasonable inference for the jury to conclude that had the crossbuck sign required by law or a flashing signal light device been maintained, the driver would have been sooner and more timely warned of the

existence of the track or the approaching train and thus able to avoid the mishap.

The collision happened at the same crossing as did that dealt with in the *Ivory Storage Co. Case, supra,* but about nine months thereafter. The former accident took place at night and the visibility and certain other facts and circumstances were different from those now presented. However, the signs erected and warning devices maintained were the same in each instance. Concerning the crossbuck sign, it was there said:

"This well-known device for many years has been regarded by the legislature as the standard crossing sign as shown by the fact that the succeeding Code section 3985a, (Michie), makes it a misdemeanor for any person to erect on or near a highway any 'device or sign which is in the form of a railway crossing sign board', unless it is required by section 3985, to warn of a railroad crossing. By this legislation, the State has appropriated that form of sign for this exclusive use so that travelers on the highways may not be misled but may rely upon it as a true warning of the proximity of a railroad crossing." (187 Va. at p. 863.)

In the former case it was also said that the proximity to a large city of this crossing over which passenger trains operated at a speed in excess of fifty miles per hour was sufficient to sustain a finding by a jury that it was a dangerous crossing. In addition to those recited facts, it now appears from exhibits (pictures of the crossing and approach thereto) filed in evidence that west of the crossing and along the south side of the highway a hedge partially obscures the view that an approaching motorist might otherwise have of a train coming from the south. Such being true, we think it proper to have submitted to the jury the question of whether or not this was a dangerous crossing, and to have informed them as to the duty of the railroad if they deemed it dangerous. If factually dangerous, a common law duty existed to provide warning signals commensurate and adequate with the danger. *Grand Trunk Ry. Co.* v. *Ives,* 144 U. S. 408, 12 S. Ct. 679, 36 L. ed. 485, and *Norfolk, etc., Ry. Co.* v. *Wilkes, supra.*

We therefore think that the jury was entitled to find that (a) the company's omission to maintain the crossbuck sign or (b) its failure to maintain at a dangerous crossing a signal device reasonably adequate to warn the driver of the approach of the train was a proximate cause of the collision. Inferences might

reasonably have been drawn from the facts proved which established a causal connection between the company's negligence and the mishap.

Instruction No. 3 complained of was given in *Ivory Storage Co.* v. *Atlantic Coast Line R. Co., supra.* The evidence here (and there) justified submission of the issues of whether or not the crossing was dangerous, and, if so, whether or not the semaphore signal device was reasonably adequate to warn the traveling public. As the skid marks disclose that Sheffield was apprised of the existence of the track when some 100 feet away, the fact that the semaphore was too high to be seen when twenty to forty feet distant becomes immaterial. We, therefore, think the specific reference in the instruction about its being "improperly located" should have been omitted. And as this device was intended to warn a traveler of a train's approach, and not the presence of a track, the concluding language, "difficult to see by a traveler over the highway using reasonable and proper care or in any wise inadequate to give timely warning of the presence of the crossing" should have read "or otherwise insufficient to give a traveler on the highway using proper care reasonable and timely warning of the approach of a train, * * *". However, among instructions given at the instance of the company was No. 9, which reads:

"That if you believe from a preponderance of the evidence that the driver of the car in which the plaintiff was riding in the exercise of ordinary care should have seen the warning devices as he approached the crossing and that he failed to do so then he was guilty of negligence as a matter of law. If you further believe that such negligence on the part of the driver was the sole proximate cause of the accident, then your verdict should be for the defendant."

This instruction informed the jury what the consequence was if Sheffield should have seen the warning devices, whatever they were, and however they may have been located, and failed to do so, if that failure was the sole proximate cause of the mishap. Other instructions submitted all theories of the case and all factual issues raised by the evidence. Instruction No. 3 was not a finding instruction. It merely recited certain duties incumbent upon the railroad and told the jury under what conditions failure to perform those duties constituted negligence. The Company acknowledged negligence in its failure to maintain the crossbuck sign and there was testimony sufficient to

establish its negligence in another particular. We have no difficulty in concluding that there was evidence to support the main factual issues submitted by the instruction complained of, that its minor defects were substantially cured by Instruction No. 9, and that it does not constitute reversible error.

Plaintiff in error sought unsuccessfully to prove certain statements made by the driver to three people several hours after the accident. They were offered in evidence as statements against interest made by an unavailable witness.

Summarized, they were that he approached the crossing with the windows of his car up, the radio playing, and the heater on, and "that he didn't hear or see anything until he got right on the train and the crossing" and "saw this engine in front of him". He didn't know how fast he was driving but said it was "around 45 an hour", and when asked wasn't it "around 50 or 55 miles an hour", he replied, "I suppose so".

The specific grounds or reasons relied upon for admission of this testimony are stated thus in the company's brief:

"The basis for the contention that this testimony is admissible in evidence is under the exception to the Hearsay Rule known as Declarations against Interest. These declarations are distinguishable from admissions of a party and apply to statements of persons who are not parties to the suit. To be admissible such statements must meet the following tests:

"1. The declarant must have since died or otherwise become unavailable as a witness.

"2. The facts stated must have been contrary to the pecuniary or proprietary interest of the declarant."

It is shown that the declarant was in Mississippi and thus beyond the jurisdiction of the trial court. It is also said that the statements were contrary to his pecuniary or proprietary interest because he had been injured and his automobile destroyed, and he might have a cause of action against the company. He may also have incurred liability to other injured occupants of his car, and so it is claimed that the statements made by him tending to indicate inattention and negligence on his part were against his pecuniary interests.

To maintain its contention plaintiff in error cites the following authorities: 2 Wigmore on Evidence, 1904 Ed., sec. 1456, et seq.; 7 M. J., "Evidence", p. 636; Vol. 9 Va. and W. Va. Digest, Evidence, key no. 272; *Harriman* v. *Brown,* 8 Leigh (35 Va.) 697. Reference is also made to *Yellow Cab Co.* v. *Eden,* 178 Va.

325, 16 S. E. (2d) 625. Most pertinent of these to sustain that contention is 2 Wigmore, *supra,* section 1457, wherein we find:

"The basis of the exception is the principle of experience that a statement asserting a fact distinctly against one's interest is entirely unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently guaranteed, though oath and cross-examination are wanting."

Significant, however, is what that author says in section 1458, which is: "But they could not be received to prove the matter as to which they were not against interest * * *."

Defendant in error says that the statements are not admissible. She insists that mere absence from the jurisdiction is not that complete unavailability required by the rule and she also in effect says that the statements in question are not pertinent to the ultimate issue being tried. As supporting defendant in error's views, the following authorities are cited: 94 Am. St. Rep. 762, et seq.; 2 Jones on Evidence, 2nd Ed., sec. 323 (327), p. 752; *Weber* v. *Chicago, etc., Ry. Co.,* 175 Iowa 358, 151 N. W. 852.

We find it said in 20 Am. Jr., *supra;* 2 Jones on Evidence, *supra,* and 3 Jones on Evidence, 2nd Ed., sec. 1165, that mere absence from the jurisdiction has not usually been deemed sufficient to establish unavailability. And in sec. 54 of 20 Am. Jur., sec. 545, p. 461, it is indicated that such a statement against interest is not admissible unless it tends to prove the final and direct fact at issue: "Evidence is not admissible unless it is relevant to the issue or issues in the case. This principle applies to admissions and declarations to the same extent that it does to other kinds of evidence. Thus, irrelevant declarations are inadmissible. Admissions and declarations are admissible where they tend to prove the principle or ultimate fact in issue and where they are directed to the establishment of pertinent evidentiary facts."

Cases dealing with the subject in a general way are innumerable. Many are collected in the annotations to *Sutter* v. *Easterly,* 354 Mo. 282, 189 S. W. (2d) 284, 162 A. L. R. 437, 446.

In this tort action the absent declarant is not a party to the cause though he may have been a joint tort feasor with the present plaintiff in error. Not being a party, his negligence or lack of negligence is not controlling of plaintiff in error's responsibility. The sole ultimate issue is whether or not the company

is liable to defendant in error. The company's ultimate purpose in attempting to secure admission of this testimony is not to fix liability upon the declarant but to exonerate and exculpate itself. Admission of the statement in this case would not be harmful to the declarant, but it would be against the interest of defendant in error and in the interest of the company.

We are not unmindful that in somewhat similar settings and for somewhat like purpose, statements or admissions against interest have been received in evidence in this jurisdiction where the declarant was dead or unavailable. Statements against penal interest were admitted in *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509; *Hines* v. *Commonwealth*, 136 Va. 728, 117 S. E. 843, 35 A. L. R. 431, and *Newberry* v. *Commonwealth*, 191 Va. 445, 61 S. E. (2d) 318.

In two recent tort actions, each styled *Carter* v. *Pickering*, 191 Va. 801, 62 S. E. (2d) 856, quite similar admissions (statements against interest if the declarant had not been a party to the causes) which had been made by one Mabrey, a party to the causes, were admitted in evidence. But we there said: "It is our opinion, when alleged joint tort feasors are sued together, the admissions against interest by any defendant are admissible at the instance of the plaintiff or at the instance of any codefendant."

More nearly decisive of this precise question than any case we have seen is *Yellow Cab Co.* v. *Eden, supra.* In sustaining the trial court's refusal to admit an alleged statement against interest made by one not a party to the cause, Mr. Justice Spratley, speaking for the court, said:

"The test of plaintiff's right to recovery was whether the defendant was guilty of such primary or concurring negligence as brought about the accident. It was not whether Perkins was also guilty of negligence. Conceding that Perkins was guilty of gross negligence, that did not relieve the defendant of its own negligence, if such negligence was a proximate cause of the accident.

"The alleged declaration against the interest of Perkins was sought to be used as a declaration against the interest of Mrs. Eden. Perkins was not a party to the action or in privity with the plaintiff." (178 Va. at p. 335.)

We are not disposed to enlarge the field in which such declarations may be admitted. Whether mere absence from the

jurisdiction be treated as the necessary degree of unavailability or not, (which we need not and do not decide), and though it be conceded that the statements were against Sheffield's pecuniary interest, he was not a party to the cause, and they were not admissible against defendant in error to exonerate the company.

*Affirmed.*