# Richmond

NORFOLK AND WESTERN RAILWAY COMPANY, A CORPORATION, AND
H. W. KNIGHT v. ROY L. SYKES, ADMINISTRATOR OF THE ESTATE OF
LUCILLE RHODES.

January 26, 1959.

Record No. 4813.

Present, All the Justices.

The opinion states the case.

*Thomas R. McNamara* (*Leigh D. Williams; Williams, Cocke, Worrell & Kelly*, on brief), for the plaintiffs in error.

*Henry E. Howell* (*Guy E. Daugherty; Jett, Sykes & Howell*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This writ of error brings under review a judgment for $15,000 entered on the verdict of a jury against the Norfolk and Western Railway Company and its engineer, H. W. Knight, for the alleged negligent killing of Mrs. Lucille Rhodes, who was a passenger in an automobile when it was struck by a train of the defendant Company at a public highway crossing in Norfolk County, near the City of Portsmouth. The parties will be hereinafter referred to as plaintiff and defendants as they stood in the trial court.

Defendants contend that the evidence proved no negligence on their part, and that, as a matter of law, the driver of the automobile was guilty of negligence which was the sole proximate cause of the accident.

Plaintiff, Roy L. Sykes, administrator of the estate of Mrs. Rhodes, contends that the evidence shows that defendants did not give sufficient warning of the approach of the train to the crossing, in view of the speed of the train and the weather conditions prevailing at the time of the accident.

The court, over the protest of the plaintiff, instructed the jury that the evidence was uncontradicted that the whistle was blown and the bell was rung as required by the statute, Code § 56-414, and that the signal devices were operating; that there could be no recovery by the plaintiff based on the speed of the train under the weather conditions if the jury believed that the signal devices at the crossing were adequate.

The decisive question presented is whether the evidence is sufficient to sustain the verdict of the jury finding that the signal devices at the crossing and the warnings given were inadequate under the circumstances.

In addition to the oral evidence, maps drawn to scale and photographs were introduced showing the approaches to the crossing, the crossing itself and the signal devices at the crossing, and these may be described as follows:

U. S. Highway No. 17, known also as the George Washington Highway, runs practically north and south in the area of the crossing and at that point is a two-lane road about 25 feet wide with double white lines in the middle. The double tracks of the railroad cross at a slight angle from the southwest to the northeast. The road is straight for 800 feet north of the crossing, and beginning at a

point about 200 feet north of the tracks it gradually rises 3.9 feet as it runs over the crossing. The crossing is smooth and paved about even with the rails. On the west side of the road, to the right of the approaching automobile, there were in addition to outbuildings four residences in a row sitting back about 75 feet from the road, the nearest one being about 125 feet north of the tracks. Some 390 feet north of the crossing near the west side of the road was a post on which, six feet above the road, was a round yellow and black unlighted sign bearing the letters "R. R." Forty feet from the north rail a county road led off to the west, about parallel with the tracks.

Between this side road and the railroad was a wigwag signal situated 11 feet west of the main highway and 12 feet from the north rail and facing north. This was erected on a concrete base 23 inches high, painted with black and white stripes. On top of that was a wire lattice about 7 inches high in which were two ordinary lights. About 6 inches above the lights was a metal sign, about 2 feet high and 3 feet wide, lettered "Stop When Swinging," each letter having a small glass reflector. Next above that was the wigwag signal, the center of which was 8½ feet above the rails. This operated on a pivot from which extended a 24-inch arm, at the end of which was attached a red cylinder in the center of which was a light of 21 candle power behind a red lens 5 3/8 inches in diameter with a metal reflector back of it. This device was so designed that it swung back and forth when an electrical relay 3185 feet west of the crossing was tripped by an eastbound train, as the train involved in this accident was going. A similar signal was at the southeast corner of the intersection facing traffic from the south, and which could be seen from both directions.

Above the wigwag and 12½ feet from the top of the rails was a crossarm railroad crossing sign, required by Code § 56-406 to be maintained at or near all public crossings "at such heights as to be easily seen by travelers." This was made of metal, bearing in capital letters the words "RAIL ROAD." Just beneath this were two signs on white backgrounds with black letters. One read "Two Tracks," and under it at the time of the accident there was a rectangular sign lettered "Slow Down, 5 Miles—Va. Law," then required by § 56-407 of the Code which was later repealed by Acts 1956, ch. 164, p. 167.

The oral evidence was in material substance as follows:

At approximately 11:20 p.m., January 2, 1956, the automobile

in which Mrs. Rhodes, the plaintiff's decedent, was riding approached this crossing from the north. Earlier that evening it had brought her husband, who was a pipe fitter in the U.S. Navy and who was driving the car, from their home in the southern part of North Carolina to his ship at Convoy Escort Piers in Norfolk. In the car with them were their 18 months old daughter, Mrs. Rhodes' sister Mary Smith, their aunt Mrs. Ellis, and Herbert White. They arrived in Norfolk shortly after 9:00 p.m., left her husband at his ship and sometime later started on their return trip home. When the automobile left the pier White was driving, Mary Smith and Mrs. Ellis were on the front seat with him and Mrs. Rhodes and her child were in the back seat. As the car went over the crossing it was struck at its rear wheel by the eastbound train, was thrown to the south side of the track, burst into flames and was demolished. Mrs. Rhodes and the two women in the front seat were killed. White was badly injured. The child was not killed.

On the night of the accident it was cold, and there was a heavy fog, described as a rolling type, one that would come and go, would rise and lower, and would be dense in some spots and thin in others.

The defendant, H. W. Knight, engineer of the locomotive, testified both as an adverse witness and as a witness for the defendants. The train was known as the second section of the "Powhatan Arrow," a passenger train operating on a fast schedule. The maximum speed allowed by the railroad's regulation was 78 miles an hour. Knight said that he had not handled this particular train more than two or three times before; but that he had operated freight locomotives in the area in question. He said he ran into a rolling type of fog before he reached Suffolk, some miles west of the crossing; that in some spots it was thick and in others much lighter; that the bright headlights of the locomotive were on; and that he could tell when he was going by Yadkins a mile west of the crossing by the stationboard west of the place and the automatic neon signal gates there. He had been running approximately 78 miles an hour until then, and he began to reduce the speed of his train until he was running 75 miles at the scene of the accident; that on reaching a whistleboard 1320.5 feet west of the crossing, he began blowing the whistle, the regular blast, two longs, a short and a long, and had the whistle in his hand when the collision occurred.

Seated on the right-hand side of the engine, Knight said he did not see the automobile of decedent until there was an explosion and a

big flash in his face as it was struck. He said the fireman had begun ringing the bell of the locomotive at Yadkins and continued to do so through the crossing. At the sound of the explosion and sight of fire therefrom, he applied his emergency brakes, shut off the throttle, and stopped the train one-half to three-fourths mile east of the crossing. When he was at the whistleboard mentioned, he saw the light of an automobile standing on the south side of the crossing, and "I could see the—those wigwag signals when you are approaching from the railroad; I don't know whether it is a light or reflection from the blinkers that you can see with the tracks; the lights on the base of the wigwag signals, could see those, sir." He said he knew that the crossing was a main highway; and that the weather conditions prevailing played no part in the speed at which he was operating the train.

The only other eye-witness of the collision who testified was the fireman of the locomotive, William E. Dalton. Dalton, sitting on the left-hand side of the locomotive, said that he turned on the bell at the Yadkins crossing, and that it was still ringing when the train reached the Route 17 crossing; that at the whistleboard about 1320 feet from the crossing, the engineer began blowing the crossing signals; that after passing the whistle board, and when the train was 1000 to 1100 feet west of the crossing, he saw the lights of an automobile approaching the crossing at a moderate rate of speed; that he saw the crossing signals, "the reflection from them or the signals working;" and did not become alarmed as it looked to him like the automobile would stop; that he then looked for his block signal, and when he looked back at the highway, the automobile was going across the open or westbound track, "seemed that he had sped up and was still speeding up to make the crossing;" and that there was a blinding explosion as the car was struck on its right rear portion, and the engineer put on the emergency brakes.

County Police Officer Peele, who had lived in Norfolk County near this crossing all of his life and County Officer Walters were on joint patrol duty the night of January 2, 1956, and had driven over the crossing from south to north three or four minutes before the accident. They received a report of a fire at the crossing at approximately 11:20 p. m. They turned around and returned, arriving there three to five minutes later. Peele said that the first thing he saw, through a heavy fog, as he approached the scene, and was about 50 feet from the crossing, was an automobile on fire. He described

the wigwag signal device as a small red light that goes back and forth, and said he had seen it operating on clear nights. It was not operating when he got to the crossing because the train had gone out of the block. About an hour later, he noticed, when a westbound train came along, that the signal worked perfectly.

Officer Walters, who was in the patrol car with Peele, said that the fog was extremely heavy as they returned to the crossing, and the first thing he saw was the blaze from the burning car. He estimated that he was then about 30 feet from the railroad tracks. He also said that he saw the red light of the wigwag signal operating when a westbound train came along after his arrival. He was then standing about 12 paces from the light, which was blurred with the fog and looked "sort of like a reflection;" but he knew it was a railroad warning light.

State Trooper Pace received a call at about 11:30 p. m., and drove to the scene. He said the fog was in some places so thick that he had to drive with his spotlight focused on the center of the road, and that at other points it would thin out and he could see fairly well. He drove with his headlights on low beam, because the fog reflected the high beam lights back in his face. The first thing he observed was a number of lights when he was about 100 feet of the crossing. Then he saw a fire truck parked in the road south of the crossing, which had a red beacon ray operating and several other flashing lights. He said that the engineer of the train told him that west of the crossing his speedometer showed he was running 78 miles an hour.

State Trooper Davis, who received a report of the accident at 11:25 p. m., also drove to the scene. He said it was extremely foggy in spots, and that he was approximately within 50 feet of the crossing before he could discern the outline of the automobiles at the crossing or see the crossarm signal.

H. W. Trump, a signal maintainer for the railroad, testified that he was called to the scene of the accident at 1:15 a.m., on the morning of January 3, 1956. He drove through a fog which was "right good and heavy at places." He examined the light bulbs in the signal devices and found them to be 11-watt. He said that in his territory (this crossing was not in his territory) there were no wigwag signals and that he used 18-watt bulbs for crossing lights. Recalled as defendants' witness, he testified that 11-watt bulbs were standard equipment on the Norfolk and Western Railroad; that he inspected

the lights at the crossing in question when he arrived there on the morning of January 3, and found that they were working properly; and that he had never tested them to ascertain how far they could be seen in a fog; "but under normal conditions" they could be seen for a mile. He thought that U. S. Route 17 was one of the busiest roads the Company's tracks crossed between Suffolk and Norfolk.

Otis W. Kitts, another signal maintainer for the railroad, said he was familiar with the signal devices at the crossing; that the lights were of 21 candle power; that he inspected them on December 30, 1955, three days before the accident, and found them in excellent shape; that he also inspected them on January 3, 1956, after the accident, and they were working properly. He identified a bulb, offered in evidence as an exhibit, as similar in size to one he had examined and removed from the signal device on January 3, 1956.

Witnesses for the defendants testified that the engine of the train was in good condition; that its headlights burned brightly and that its brakes, whistle and bell were in proper condition.

The Company's Civil Engineer filed a map showing that from a point in the center of the highway 125 feet north of the eastbound track, on which the engine was approaching, there was a line of vision along the track 460 feet west of the crossing; and that from a point 100 feet north of the eastbound track the view westward was clear along the track for a distance of 817 feet west of the crossing; and from a point on the map 75 feet north of the eastbound track the westward view along the track was unlimited, the track being perfectly straight as far as the eye could see. The highway north of the crossing was straight for a distance of over 800 feet, and on its west shoulder there was a yellow and black railroad crossing sign 393.65 feet north of the eastbound track.

James B. Carey testified that he had lived in the area of the crossing all his life. He had left his filling station about 11:30 that night, and was driving toward the crossing just behind McCoy, another witness. As he drove south toward the crossing, and was between 75 and 100 yards to the north, a distance he ascertained by stepping it off a day or so before he testified, and passed the sign reading "RAILROAD," "almost simultaneously I saw the last one or two cars of this train going through the crossing;" that at the same time he saw the flashes flashing (meaning the wigwag signals) one or two times, and then stop as the train got through. There were lights, he said, in the two passenger cars, and fire on the other side

of the crossing, "and I honestly believe the light I saw was what made me see the train cars, more or less." The first thing he did after seeing the lights of the wigwag signal and a burst of flame from the stricken automobile, when he was distant 75 to 100 yards from the crossing, was to drive past two cars ahead of him, one of them driven by McCoy, and the other a Buick, with an unknown driver, ahead of the McCoy car. After he passed the two cars, he turned to his right into the road, which is parallel to and 40 feet distant from the north railroad tracks, parked his car, and went to the scene of the accident. He thought the Buick car either stopped and parked on the side of Route 17, or turned into the road paralleling the railroad tracks. He further said that living in that area, he had gone over the crossing many times, and usually looked and listened for approaching trains. On that night his windows were closed, and he did not hear the whistle of the train or any other signal.

Virgil H. Kee testified that he lived on Route 17, his home being the first house south of the railroad track on the left side, 525 feet from the crossing. Asked if he recalled the accident on January 2, 1956, he said that, while upstairs in his bedroom, he heard the whistle of the train "regular long drawn out—several blasts," the normal crossing whistle, before it reached the crossing, and then the crash from the collision. He was unable to estimate the time he heard the signals before the collision. He looked out of his window after the accident, and saw the train stopped down the track approximately 1400 feet from the crossing.

William L. McCoy was familiar with the crossing and had driven across it for ten or twelve years. He had left his service station at 11:00 p. m. that night. There was a rolling fog which was freezing on his windshield. As he approached the crossing from the north, traveling at 25 or 30 miles an hour, the first thing he saw was lights through the train which he took to be headlights of cars on the opposite side of the track but found to be the burning car. He was, he said, "50 yards, 100, 150 feet. It is hard to say," from the crossing when he first saw these passenger cars. He did not see the engine; it was already through the crossing. He did not, at the time of the trial, a year and three months after the accident, recall seeing the wigwag signals as he approached but he could not say they were not working. He admitted, however, that two days after the accident he had told a representative of the Railway Company that he saw the signal operating when he was 50 yards from the crossing.

He testified that he heard no whistle or bell until the train was going through the crossing and then he heard the whistle.

The evidence does not show who was driving the car occupied by decedent. In the trial of the case, it was assumed that Herbert White was the driver, since he was under the wheel when the car left Norfolk on the fatal trip. However, White was not called as a witness, nor was his deposition taken. The presumption is that his evidence would not have been helpful to plaintiff's case. *Altavista Cotton Mills* v. *Lane*, 133 Va. 1, 13, 14, 112 S. E. 637, 640; *S. H. Kress & Co.* v. *Musgrove*, 153 Va. 348, 149 S. E. 453.

The sole duty of a railroad company with respect to warnings at a crossing, is to give an approaching motorist who, himself, is exercising due care for his own safety, a reasonable and timely warning of the approach of a train. *Norfolk & Western Ry. Co.* v. *Wilkes' Adm'r.*, 137 Va. 302, 119 S. E. 122; *S. A. L. R. Co.* v. *Crowder*, 191 Va. 635, 62 S. E. 2d 227; *Bangley* v. *Virginian Ry. Co.*, 195 Va. 340, 78 S. E. 2d 696.

The affirmative evidence of the two eye-witnesses, the engineer and the fireman of the train, was uncontradicted, and their testimony being credible and the witnesses being unimpeached, no court or jury can properly disregard it. *Messer* v. *Commonwealth*, 145 Va. 838, 845, 133 S. E. 761; *Worsham* v. *Commonwealth*, 184 Va. 192, 194, 34 S. E. 2d 234.

They saw the signal lights or a reflection from them from a distance of at least 1000 feet as the train approached the crossing. They were seen by the witness Carey from a point 75 to 100 yards north of the crossing. The witness McCoy, two days after the accident, said he saw them operating from a distance of 50 yards north of the crossing. Other witnesses said they did not see them until they were within shorter distances; but they did not deny the operation of the lights.

Whether or not the driver of decedent's automobile saw the light signals, or heard the warnings sounded, at which point he saw the lights or heard the signals, we do not know. Testimony implying a contradiction of the engineer and fireman is based on speculation and surmise. Likewise, one may only conjecture as to the action or inaction of the driver of the car. His action may have been due to blindness caused by the lights of the car approaching from the south, to a mechanical defect in his car, to a physical condition, to his preoccupation in other matters than driving, or his desire to

beat the train to the crossing, for which the defendants were not responsible.

In the recent case of *Southern Railway Co. v. Barden*, 200 Va. 98, 104 S. E. 2d 13, this was said, "we have repeatedly held that the positive testimony of a credible witness, who testifies that he saw or heard a particular thing at a particular time, ordinarily outweighs that of a number of other witnesses, equally credible, who, with the same opportunities, testify merely that they did not see or hear it. And where it appears that a positive witness is guilty of perjury unless his statement is true, while a negative witness may be honestly mistaken, the issue should be found in favor of the former if the witnesses are of equal credibility." 200 Va. at pages 102 and 103.

See also 20 Am. Jur., Evidence, § 1187, page 1039, to the same effect.

It is undisputed that at the time of the accident, all statutory requirements with regard to the operation of the train, the construction and maintenance of railroad grade and crossing boards, lights and reflectors, and slow-down signs were observed by the Railway Company. In addition, the Company erected and maintained wigwag signal devices at the crossing and the lights of those devices were automatically put in operation when the train was 3000 feet west of the crossing; the headlights of the train were burning brightly; and the speed of the train was within lawful and regulated limits.

There is not a scintilla of evidence to show that the speed of the train had anything to do with the accident. The car was driven on the tracks immediately in front of the oncoming train and, under such circumstances, the accident would have happened no matter at what speed the train was traveling.

Visibility at the time of the collision was poor due to foggy conditions. The driver of the automobile, it is true, lived in another State, but whether he or she was familiar with the crossing we do not know; but familiar or not, the driver was not relieved from the duty to use his or her faculties of sight and hearing, particularly under the weather conditions which prevailed at that time. The driver of the automobile was bound to have known that other roads intersect highways, as well as railroads, that people travel such intersecting roads, and trains move over grade crossings. Charged with that knowledge, the duty devolved upon him to exercise care commensurate with the hazards imposed upon him. *Norfolk & Western Railway Co. v. Eley*, 157 Va. 568, 573, 574, 162 S. E. 3.

It seems manifest that the driver of the car saw, or should have seen, the lights of the wigwag signal in time to have stopped or turned into the highway which ran parallel with the easterly track of the railroad. Had he exercised ordinary care and caution he could have seen, and would have seen, the headlights of the approaching train, at a sufficient distance away to give him time to bring his car, traveling at a moderate speed, to a stop, or turned to the west into the road parallel to and 40 feet distant from the northerly railroad track. He could have heard, and would have heard, the whistle of the engine, and the ringing of its bell if he had listened when listening would have been effective.

The fog was thin enough for two witnesses to see the wigwag signals from a distance of 1000 feet. It was thin enough for them to see the headlights of automobiles approaching the crossing from both the north and the south. It was thin enough for a witness to see the train 1400 feet away after the collision. The fog did not interfere with hearing.

It is a highly significant fact that every automobile known to have been driving toward the crossing at the time of the approach of the train on the night of January 2, 1956, except the one occupied by the decedent, stopped before going over the crossing. Carey and McCoy, traveling in the same direction as decedent's automobile, saw the wigwag signals working, and the fire-light of the burning car, and stopped; the driver of the Buick car ahead of them either stopped and parked his car beside the highway, or drove it into the county road 40 feet from, and parallel to the northern railroad track; a north-bound automobile which the engineer of the train saw when the train was distant over 1300 feet from the crossing, stopped to permit the train to pass. Certainly warnings of the train's approach were adequate as to the drivers of these cars.

There is no evidence that defendants were guilty of any negligence. On the other hand, the evidence amply shows that the warnings given were unheeded by the driver of the automobile. The fact is that he failed to use the due and ordinary care required of a normal person under the circumstances which existed, and this negligence constituted the sole proximate cause of the collision.

For the reasons stated, the trial court erred in refusing to sustain the motion of defendants to strike the evidence. Since the negligence of the driver of the car was the sole proximate cause of decedent's

injuries, her personal representative is not entitled to prevail in this action.

Having reached this conclusion, it is unnecessary to consider the remaining assignments of error which relate principally to the propriety of the instructions given or refused.

The judgment is reversed, the verdict set aside, and final judgment will be here entered in favor of the defendants.

*Reversed and final judgment.*

Buchanan, Miller and Snead, JJ., dissenting.

Buchanan, J.:

We dissent from the conclusion reached by the majority in this case because we believe it is contrary to the established legal principle governing the weight of a jury's verdict approved by the trial judge, as this one was, and because it gives no weight to facts which the jury could and did consider in arriving at their verdict.

The legal principle referred to is stated as recently as today in *Bates* v. *Thompson, ante* p. 501: "We have repeatedly held that if reasonable men may differ as to the conclusion of fact to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, a jury is the proper tribunal to decide the question."

Otherwise expressed, the question of negligence is a question of fact and the jury is the trier of such question. "It is only when the issue is one about which reasonable persons cannot differ—the question so plain in the meaning and interpretation that should be given to it—that no doubt is admitted of its legal significance and effect, that it becomes a question of law for the courts to determine." *Virginia E. & P. Co.* v. *Steinman*, 177 Va. 468, 474, 14 S. E. 2d 313, 315.

The jury found that the signal devices were not adequate. The trial judge held that there was sufficient evidence to support their verdict and three judges of this court also say that there was sufficient evidence to support the verdict. Not so long ago this court advanced the theory that "(w)hen such is the case, it is conclusive that it should go to the jury, for the justices must be presumed to be fair-minded men, and if they differ, they honestly differ." *Virginia E. & P. Co.* v. *Wright*, 170 Va. 442, 447, 196 S. E. 580, 582.

However that may be, we base this dissent on evidence in the

record, which in our opinion inescapably requires the issues to be decided by the jury, under the familiar rule that the evidence must be evaluated in the aspect most favorable to the plaintiff and effect given to all reasonable inferences the jury could draw from it.

First as to the weather conditions: These conditions cannot be played down. Officer Peele said the night was cold and the fog was very, very heavy. Officer Walters said the fog was extremely heavy. Trooper Pace said he had to drive with his headlights on low beam because the fog would reflect high beam lights back in his face. McCoy said there was a rolling fog which was freezing on his windshield. Trump, defendant's signal maintainer, said that when he looked into the fog he could not see anything, but could see the edge of the road when he kept his eyes down. Defendants' witness Carey had to keep his windshield wipers on because of the heaviness and the moisture of the fog.

This crossing was along the north edge of the Dismal Swamp. The time was in January. The engineer of this train said he had operated trains before in the fog in that area. Carey said he had seen fogs of this type in that area ever since he was a small child. The jury could say from this evidence that the defendant knew or was chargeable with knowledge that fog similar to that prevailing on the night of the accident might be expected at that time of the year at that crossing. Not only so, but the engineer knew it prevailed that night. It was generally foggy, he said, all along the line and at spots it was thick. He could not see the mileposts as he went along but, as he said, he took no account of this condition in the speed of his train.

Defendant's signal maintainer said that U. S. Highway 17 at the crossing was one of the busiest roads that the Company's tracks crossed between Suffolk and Norfolk.

It was over this busy crossing on this cold, foggy night that the defendants elected to run this train at a speed of 75 to 78 miles an hour. The majority opinion says the speed of the train had nothing to do with the accident and that the accident would have happened no matter at what speed the train was running. The fact is, however, that the automobile was struck at its rear wheels. It lacked just that much of getting across. Had the train been running at even 60 miles an hour the accident would not have happened. The point is that the greater the speed the greater the necessity for clear and timely

warning. To say that the speed of the train had nothing to do with the accident is wholly unrealistic.

The speed of a train at a crossing is not of itself negligence *per se*. 44 Am. Jur., Railroads, §§ 511-12, pp. 751-3; *Seaboard Air Line R. Co.* v. *Crowder*, 191 Va. 635, 643, 62 S. E. 2d 227, 231. But the speed at which a train was moving may be an essential element in considering whether the railway company was negligent in a situation where the crossing was much used by the public or rendered dangerous by obstructions. 44 Am. Jur., Railroads, § 512, p. 753; Anno. 154 A.L.R. 212 at 235; 3 Shearman & Redfield on Negligence, Rev. ed., § 451 at 1081.

So in *Carbone* v. *Boston & Maine R. R.*, 89 N. H. 12, 192 A. 858, 860, it was said: "If the defendant saw fit to run its trains over a crossing carrying the heavy traffic above described, in the night, and without regard to weather conditions, at a speed of 45 miles per hour, it was for the jury to say whether ordinary prudence would not require provision for a more effective warning of the approach of trains than was furnished by the whistle and bell of the locomotive." Cf. *Southern Pac. Co.* v. *Haight*, (9 Cir.) 126 F. 2d 900, 908; *Atlantic Coast Line R. Co.* v. *McKinley*, (5 Cir.), 84 F. 2d 33, 34.

It is to be remembered, too, that the occupants of this car were strangers to this crossing. "The duty of a traveler to look and listen for an approaching train *when he knows of the existence of the crossing* is very different from that of the traveler who is *ignorant of its existence*. * * '(W)e do not believe such duty exists until he has knowledge, or by the exercise of reasonable care, should have had knowledge that there is, in fact, a crossing. * *.' " *Ivory Storage Co.* v. *A.C.L.R. Co.*, 187 Va. 857, 874, 48 S. E. 2d 242, 251.

As this automobile approached this crossing the view of its occupants toward the west where the train was coming from was obstructed by the houses. Having no knowledge of the presence of a crossing, they could reasonably have failed to look between the houses, and if they had looked it could well have been at a point from which they could not see. There was no fair view for a motorist approaching from the north until he had passed the houses, and only then if he happened to be looking immediately in the direction the train was coming from and recognized the light he saw, if he could see it at all in the fog, as the headlight of an engine approaching on a track he did not know was there.

The majority opinion says it is undisputed that all statutory requirements were observed by the Railway Company. Let us see just what help that was to the people in this car.

The jury were instructed that the evidence showed that the statutory signals were given. Conceding that they were, the fact remains that not a single witness traveling in an automobile at or near this crossing that night heard any whistle or bell. The two witnesses who arrived at the crossing before the train was completely across, McCoy and Carey, both testified that they heard no whistle or bell before the train reached the crossing, and neither saw the train approaching. Moreover, the whistleboard where the signals began was 1320.5 feet from the crossing. At 78 miles an hour the engine was on the crossing in 12 seconds after the whistle first blew. So far as the statutory signals were concerned, the engineer and fireman had as well been blowing a tin whistle and ringing a sleigh bell.

It was such considerations that led this court to hold that it is the over-all duty of the railroad to provide adequate warning of the approach of its train to a grade crossing and "the statutory requirement [of whistle and bell] is merely the minimum precaution which the railroad company is required to exercise." *Ivory Storage Co.* v. *A.C.L.R. Co., supra,* 187 Va. at 869, 48 S. E. 2d at 249. *Grand Trunk Ry. Co.* v. *Ives,* 144 U. S. 408, 12 S. Ct. 679, 36 L. ed. 485; 44 Am. Jur., Railroads, § 520 at 765; Anno. 5 A.L.R. 2d 112-116; 74 C. J. S., Railroads, § 742, p. 1388.

The crossarm signal required by § 56-406 of the Code to be erected and maintained at grade crossings "at such heights as to be easily seen by travelers" was in this case 12½ feet above the rails and approximately 16 feet above the road level north of the crossing. It carried no reflectors. Trooper Davis said he could not see it that night until he was within 50 feet of the crossing. It was of no help to the driver of this automobile who, as the jury could readily conclude from the evidence, had to drive with his lights on low beam and watch the side of the road as he drove along in the fog. None of the five witnesses for the plaintiff who approached the crossing from the direction this automobile came said they saw the unlighted yellow and black sign north of the crossing.

The jury could reasonably believe from the evidence that there was nothing at this crossing or on the approach to it to apprise the driver of this automobile that he was coming to a railroad crossing.

The only warning from any source that was of any value on this night to give notice of the approach of the train was the wigwag signal.

This was not the flashing type of signal and was equipped only with an 11-watt bulb, whereas one of the defendant's signal maintainers testified that an 18-watt bulb was the standard. This appears in his testimony: "Q. This 11-watt light is an old-timey type of light, isn't it? A. No, sir. No. We use that in all our signals on the Norfolk & Western Railroad. That is our standard. Q. You are talking about 16 watts? A. No. 11 volt, 11 watts. That is for our signals we use them all the time. Q. I know that, but not for your signals where the cars are approaching? A. Oh, no."

Witnesses referred to this signal as a single small red light. Officer Walters testified that when he saw it operating as a westbound train came along later, he was standing 12 paces from it and even then it was blurred with fog and "sort of like a reflection." What the engineer and fireman said they saw was its reflection against the fog. When McCoy and Carey, both of whom had been familiar with the crossing for years, momentarily saw the signal operating as the last two or three cars were passing over the crossing, they were aided by the light from the flaming automobile beyond the crossing. As a warning this signal was materially less adequate than the neon lights on the gate maintained at the Yadkins crossing which enabled the engineer to tell that he was going by Yadkins just a mile away from the crossing here involved.

Very clearly we think the jury had a right to conclude that this wigwag signal was not adequate to give effective warning of the approach of this train at a speed of 78 miles an hour on a night in which Officer Peele said he could not see the burning automobile until he was within 50 feet of it, and Officer Walters said he was within 30 feet of the tracks before he could see the light from that fire.

The majority opinion says it is highly significant that every automobile known to have been driving toward the crossing at the time of the approach of this train, except the one occupied by the decedent, stopped before going over the crossing. Let us look at the facts. Neither Carey nor McCoy, familiar as they were with the crossing, stopped because they had any warning of the approach of the train. The train had struck the automobile and all but the last two cars of the train had gone through the crossing before either

Carey or McCoy got there. Neither of them saw the train approaching the crossing or heard it give any signal. The first they knew about a train being there was when they saw the last of its cars on the crossing. The train itself on the crossing and not any signals or any sight of its approach is what caused them to stop. Carey said, "I honestly believe the light I saw [from the burning car] was what made me see the train cars, more or less."

The opinion further says that the driver of the Buick car ahead of McCoy and Carey stopped and parked his car in the county road that ran parallel to the track. The fact is that the evidence does not show when or why the Buick stopped or how long it had been parked, why it was there or to whom it belonged. McCoy did not mention seeing such a car. Cary was asked what movement that car was making, and this was his reply: "I could not state whether he was parked or was in the process of being parked."

The driver of the northbound car did not testify in this case but did testify in No. 4814 and his testimony as to why and how he stopped is revealing also on the question of the adequacy of the signals.

The most significant fact in this case is that the signals of the approach of this train were not adequate under the conditions then prevailing to warn the driver of this automobile of the approach of this train at its high rate of speed. It is not to be presumed that he saw the signals in time to stop and then drove on heedlessly at the risk of his own life and the lives of his passengers.

The question for the jury was whether under the circumstances of speed and weather the Railway Company exercised reasonable care and prudence in what it did and whether "under the circumstances described, taking into consideration the physical conditions of the crossing, the extent of its use by the public, the nature of the surroundings, the speed of the train, and other matters tending to show exceptional dangers incident to the particular locality, they performed their duty toward persons using the highway." *Cummings v. Pennsylvania R. Co.*, 301 Pa. 39, 42-3, 151 A. 590, 591, 71 A.L.R. 1156, 1158-9.

If the defendant elected to run its train through this fog over this crossing at a speed of 75 to 78 miles an hour, its right to do so carried a correlative duty "to provide warning signals commensurate and adequate with the danger." *Atlantic Coast Line R. Co. v. Bowen*, 192 Va. 162, 168, 63 S. E. 2d 804, 807. An adequate warning to a

stranger exercising reasonable care would necessarily be one sufficient to warn him of the presence of the crossing and the approach of the train in time to enable him to avoid being struck. Reasonable minds could well differ as to whether the small red light waving back and forth in an arc on a 24-inch arm afforded a warning commensurate with the danger of running this train at 75 to 78 miles an hour over this crossing through this fog.

As said in the *Ivory Storage Co.* case, *supra,* approving the statement in the *Ives* case, *supra,* " '(E)ach case must stand upon its own merits and be decided upon its own facts and circumstances; and these are the features which make the question of negligence primarily one for the jury to determine, under proper instructions from the court.' "

As was said in *Kansas City S. Ry. Co.* v. *Wiggins,* (5 Cir.), 234 F. 2d 128, 132, "reasonable minds might well say of the facts here, as did the jury, that the underlying cause of this event was ignorance of the crossing flowing from the Railroad's negligence."

We agree with the trial court that there was sufficient evidence to support the finding of the jury that the defendant company was negligent in failing to have adequate warnings at the crossing and that its negligence was a·contributing cause of the accident. That being true, it follows that the alleged negligence of the driver was not the sole proximate cause as a matter of law, as held in the majority opinion.

For the reasons stated it is our opinion that the judgment below should be affirmed.