# Richmond

## John F. Ivory Storage Co., Inc. v. Atlantic Coast Line Railroad Co.

June 14, 1948.

Record No. 3339.

Present, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Sands, Marks & Sands* and *M. Wallace Moncure, Jr.*, for the plaintiff in error.

*J. M. Townsend* and *Denny, Valentine & Davenport*, for the defendant in error.

STAPLES, J., delivered the opinion of the court.

This action was brought in the Hustings Court of the city of Richmond, Part II, by the plaintiff in error, John F. Ivory Storage Co. Inc., against the defendant railroad company for damage to the plaintiff's truck which was run into by one of defendant's passenger trains at a grade crossing. The defendant filed a cross-claim for damage to the locomotive and certain signal equipment which resulted from the collision. The trial court instructed the jury that there was no evidence upon which they could find a verdict for the plaintiff, and submitted to the jury the question whether or not the damage to the railroad company's property was caused solely by the negligence of the driver of the plaintiff's truck. Upon this issue the jury returned a verdict for the railroad company on its cross-claim, on which judgment was entered.

The two main questions presented for consideration are, first, whether there was evidence of defendant's negligence sufficient to require submission to the jury, and, if so, second, whether the driver of the plaintiff's truck was guilty of contributory negligence as a matter of law, or whether the evidence also required submission of this question to the jury.

The circumstances under which the accident occurred may be briefly summarized as follows: The plaintiff's truck was traveling in an easterly direction along U. S. Route No. 60, locally known as the Midlothian Turnpike. It was about ten o'clock on the night of April 29, 1946, and the weather was misty and foggy. The driver of the truck was a stranger in this vicinity, which was about a mile west of Richmond, and was ignorant of the fact that he was approaching a railroad crossing. The railroad did not run parallel with the highway but crossed at nearly a right-angle. There were two tracks, one for northbound trains, and the other for those southbound. The plaintiff's driver did not see any of the crossing signals alongside the highway and was not conscious of the existence of the crossing until he saw the rails of the track twenty or thirty feet in front of him. He immediately shifted into third gear and slowed down the speed of the truck, which was traveling at about twenty-five or thirty miles an hour. He then looked first to his left and next to his right, where he saw the headlights of the approaching northbound locomotive. At that time the tractor was already on the southbound track. The driver, not being familiar with the operation of the trains, and not knowing whether the train was running on the track he was then on or the one in front of him, speeded up his movement in an effort to get across safely. The tractor and the driver did cross, but the locomotive of the passenger train struck the semi-trailer, cutting off the rear half and carrying it forward about five hundred feet.

The position of the plaintiff is that the evidence was such as to justify the jury in finding that the defendant was negligent, first, in not providing adequate warning signs along the highway west of the crossing, and, second, in failing to give proper warnings by blowing of the whistle of the locomotive and the ringing of its bell.

Upon the question whether the defendant was negligent in failing to provide adequate warning signs along the highway, we think the evidence, which we must consider from

the standpoint most favorable to the plaintiff, was sufficient to go to the jury.

Section 3985 of the Code provides, among other things, as follows:

"*Section 3985. Construction and maintenance of 'railroad crossing' boards.* Every railroad company shall cause signal boards, well supported by posts or otherwise, at such heights as to be easily seen by travelers, and not obstructing travel, containing on each side, in capital letters, at least five inches high, the following inscription: 'railroad crossing,' * * * to be placed, and constantly maintained, at each public highway where it is crossed by the railroad at the same level * * * so as to be clearly discernible to travelers approaching the railroad crossing from each direction at a distance of two hundred feet away; * * *."

Plaintiff takes the position that the "signal boards" or "railroad boards" required by this section are the customarily used crossing signals in the form of an X or cross; that regardless of the words thereon the shape of this sign is itself a warning or proclamation that a driver is approaching a railroad.

This well-known device for many years has been regarded by the legislature as the standard crossing sign as shown by the fact that the succeeding Code section, 3985a (Michie), makes it a misdemeanor for any person to erect on or near a highway any "device or sign which is in the form of a railway crossing sign board," unless it is required by section 3985, to warn of a railroad crossing. By this legislation, the State has appropriated that form of sign for this exclusive use so that travelers on the highways may not be misled but may rely upon it as a true warning of the proximity of a railroad crossing.

Defendant admits that no sign of this type was erected by it at or near the place of the accident. It contends, however, that this requirement of section 3985, as above quoted, was repealed by implication by the following provision of paragraph (c) of section 84 of the Motor Vehicle Code (Code section 2154(131) (c) (Michie)):

"Except in cities and towns it shall be the duty of steam railway companies to erect and maintain, at every point where a public highway crosses such railway at grade, and on which line trains other than purely local trains are operated, a sign, visible for one hundred feet on each side of its tracks with the words, 'slow down, five miles-Virginia law,' in letters at least six inches in height, painted in black upon a white background. Such signs shall be rectangular in shape, and of sufficient height to carry in two lines the words above required, and shall be of proportionate length."

■ We do not think that the foregoing provision can be construed as repealing or superseding the requirement for the signal boards contained in the other section. Both statutes were passed many years ago. The provision respecting railroad crossing signal boards contained in section 3985 is first found in the Acts of 1902-3-4, c. 609, as section 49 of Chapter 4 of "An Act Concerning Public Service Corporations." It was also carried in Code 1904 (Pollard's) as section 1294-d(49). Section 84 of the Motor Vehicle Code, providing for the rectangular sign, was first enacted in 1932 and was obviously designed to supplement the requirement for the crossing signal boards contained in the earlier act. The only information required to be carried on the rectangular sign is that the driver must slow down to five miles to conform to Virginia law. This informatory sign as to the speed limit applicable is not required to be placed at every railroad crossing, but only those on which "trains other than purely local trains are operated." Furthermore, the sign does not warn the approaching driver of *the existence of a railroad crossing*. Neither the word "railroad" nor the word "crossing" is required to be placed on the sign. We do not find in the two statutes any inconsistency or repugnance whatsoever. The primary purpose of the crossboard sign is to warn the driver of the existence of the railroad crossing, whereas the purpose of the rectangular sign is to inform him as to the speed requirements prescribed by Virginia law in approaching the crossing.

The fact that the General Assembly has not regarded

these two sections as repugnant is shown by the further fact that they have both been included in the same act for the purpose of making certain minor amendments in their provisions. Chapter 236 of the Acts of 1946 is devoted exclusively to this purpose of amending these two sections. It is obvious from this action of the General Assembly in including both within the same act that it was intended that they were to supplement one another. We do not find in them any inconsistency.

The defendant further argues that the *rectangular sign* which it maintained complies with the requirements of both sections. The sign contained the words "Slow down-five miles-Virginia law" and below it the words "Atlantic Coast Line." The sign was supported by a post on which was written vertically the words "RR Crossing". The plaintiff does not contend that this sign fails to comply with section 84 of the Motor Vehicle Code so we express no opinion on the question whether adding to the sign words not specified in the statute would render it harder for the traveler to understand in driving by, and hence was not a compliance therewith. But the sign, in neither its design or shape, nor in the words contained thereon, conforms to the requirements of section 3985. The latter section requires the signal boards to contain on each side thereof in capital letters at least five inches high the inscription "railroad crossing." The record does not indicate the size of the letters in which the defendant's inscription "RR Crossing" was painted on the post. In addition to this, there is also the admitted failure to have the customary crossing signal board which, as a matter of common knowledge, travelers on the highway of Virginia have been accustomed to regard as a proclamation of danger and a warning that a railroad crossing is being approached. We think that the question whether the failure to provide this sign was a proximate cause of the accident should have been submitted to the jury. *Atlantic Coast Line R. Co. v. Church*, 120 Va. 725, 92 S. E. 905.

The plaintiff also complains that the semaphore light

which the defendant maintained at the crossing was not adequate to warn travelers on the highway of the existence of a crossing or of the approach of a train. It is an automatic signal equipped with a paddle, the normal position of which is upright, and when in that position a green light is shown. When an approaching train arrives at a distance five hundred yards from the crossing, the electric circuit is broken and the paddle falls into a horizontal position. The green light then turns red. M. M. Todd, Associate Engineer with the State Highway Department, testified that the location of the light was too high to be seen at night, it being approximately fourteen feet above the pavement, whereas the ideal position is three and one-half feet. He testified further that the State Highway Department had called the defendant's attention to this condition by a letter dated January 8, 1944, and had suggested that "the installation of the type of warning device known as flashing signals be substituted for the existing semaphore signal"; that the matter had been taken up with the company approximately once each year since then, but that up to the time of the trial nothing had been done about it. H. N. Terrell, a Chesterfield county police officer, also testified that the automatic signal was very hard to see, and that at night "you can just see a light, but you can't see whether the paddle is down or whether it is up."

Section 3985 of the Code, in addition to its requirement above mentioned that railroad companies provide the signal boards, was amended in 1928 so as to provide also that lights or reflectors "at such heights as to be easily seen by travelers" shall be placed and maintained by the railroads at State highway crossings when ordered to do so by the State Corporation Commission. But this section does not impose any such duty as a matter of law, except when so ordered[1]. The signal light at this crossing was not ordered or approved by the State Corporation Commission but was erected pur-

[1] The section as amended also confers such jurisdiction on the commission as to crossings of roads other than State highways in cases where signal lights had already been installed when the act was passed.

suant to permission of the Board of Supervisors of Chester-
field county, which was expressed in the minutes of its
meeting held August 26, 1918, as follows:

"This day came Wm. B. McIlwaine, Virginia Counsel,
and A. W. Stewart, Supervisor of Signals, of the United
States Railroad Administration, W. G. McAdoo, Director
General of Railroads, Atlantic Coast Line Railroad, and
made application to be permitted to safeguard the grade
crossings of Broad-Rock, Bell, Warwick, Midlothian and
Bon Air Roads, at what is known as the New James River
Belt Line, by the installation of a semaphore signal at each
of said crossings, governing the approach from both direc-
tions; and the Board, approving the said semaphore signal as
the best device that can now be adopted for the safety of
the traveling public, doth hereby adopt the same at the
crossings aforesaid and doth authorize such installation."

Since the Corporation Commission did not order a signal
light or reflectors to be installed at this crossing, there
is no evidence which would justify submitting to the jury
any question of the violation by the defendant of the pro-
visions of section 3985 with respect to providing such lights
or reflectors.

The plaintiff insists, however, that, independent of the
statute, the defendant owed a common law duty to install
and maintain reasonably safe lights at this crossing, and
that the evidence required the submission to the jury of
the question whether the defendant discharged this duty.

■ The position is well taken. The evidence shows that
the operators of this railroad long have considered the cross-
ing a sufficiently dangerous one to require warning lights.
The semaphore type of light in use was voluntarily installed
nearly thirty years ago, with the permission, but not upon
the order, of the county authorities. There is nothing
in the record to indicate that a light of this type is still in
common use for a crossing of this character, or that the
ordinary traveler, unfamiliar with local conditions, seeing
the light fifteen feet above the highway would have any
reason to regard it as indicating the existence of a railroad

crossing. There is testimony of two witnesses that the light is too high to be easily seen by a traveler, and particularly so on a foggy night. The State highway authorities had repeatedly called· this to the attention of the defendant, and had suggested that the semaphore be replaced with the commonly used type of warning device known as flashing light signals.

The defendant concedes the existence of the common law duty to provide adequate warning signals at dangerous crossings, but relies upon *Norfolk, etc., Ry. Co. v. Wilkes,* 137 Va. 302, 119 S. E. 122; for the proposition that the burden is upon the plaintiff to prove both the dangerous character of the crossing and the negligence of the defendant in failing to provide adequate warning lights.

The fact that passenger trains run at speeds in excess of fifty miles an hour across this important State highway in the vicinity of a large city is shown by the undisputed evidence. This fact alone is sufficient for the jury to find the crossing a dangerous one. Moreover, the action of.the defendant itself in maintaining the semaphore light for many years is evidence that it considers the crossing as falling within this category. The testimony of the two witnesses above referred to is sufficient to make it a jury question whether the warning light provided by the defendant is improperly located, is hard to see, and is inadequate.

Defendant further argues that the jury should not be permitted "to substitute its judgment for the opinion and judgment of the State Corporation Commission, the governing authorities of Chesterfield county and the practical experience and judgment of the railroad company."

There is no evidence in the record, however, that the question of the adequacy of the defendant's semaphore signal light has ever been referred to, considered, passed upon, or approved by, the State Corporation Commission. On the other hand, the above quoted order entered by the board of supervisors of Chesterfield county approving the "semaphore signal as the best device that can now be adopted for the safety of the traveling public" was entered in 1918.

When it is considered that this language was used by the board of supervisors about thirty years ago, it can hardly be construed as an expression of its approval of the semaphore type at the time of the accident even if the board still possessed any legal authority over the highway. However, since the old county road became a part of the primary State highway system, the State highway commissioner has been vested with jurisdiction in matters of this kind. The extent of his authority is to request the State Corporation Commission to require the railroads to install the lighting facilities at crossings which he recommends. It does not appear that he made any such request with respect to the crossing here involved. Therefore, the semaphore light at the crossing was not installed by the defendant pursuant to or by reason of any statute.

But even if it had been installed in compliance with a statutory duty, it is well settled that this alone is not conclusive proof that the railroad's duty to provide adequate warning in every case has been complied with. As pointed out in *Norfolk, etc., Ry. Co.* v. *Wilkes, supra,* citing *Grand Trunk Ry. Co.* v. *Ives,* 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485, the common law duty exists in all cases where the circumstances render the statutory warning inadequate in fact. In other words, the statutory requirement is merely the minimum precaution which the railroad company is required to exercise.

The defendant contends that the fact that the State Corporation Commission did not order it to install a different type of light should itself be considered as conclusive evidence that the light it maintained was an adequate warning to travelers. We cannot agree. A railroad cannot shift to the Commission its duty and responsibility to determine what are adequate warning devices at a particular crossing. Furthermore, it would be obviously impossible for this State agency to successfully perform such a function.

Our conclusions on this question are in accord with the reasoning expressed in the opinion of Mr. Justice Lamar in the *Ives Case, supra,* where he said:

"* * * The underlying principle in all cases of this kind which requires a railroad company not only to comply with all statutory requirements in the matter of signals, flagmen and other warnings of danger at public crossings, but many times to do much more than is required by positive enactment, is, that neither the legislature nor railroad commissioners can arbitrarily determine in advance what shall constitute ordinary care or reasonable prudence in a railroad company, at a crossing, in every particular case which may afterwards arise. For, as already stated, each case must stand upon its own merits and be decided upon its own facts and circumstances; and these are the features which make the question of negligence primarily one for the jury to determine, under proper instructions from the court." (144 U. S., at page 427).

The defendant also argues that, since the plaintiff's driver testified that his lights were on a low beam on account of the fog and he could not see the rectangular sign maintained by the defendant, he would likewise have been unable to see the customary "railroad crossing signal boards." The driver stated that in such a fog his lower beam lights were better than the high beam. Defendant's position is that, under the circumstances, the failure to provide these crossing board signals could not have been a proximate cause of the injury. If the actual conditions at the crossing were such, as the defendant here asserts, that a traveler on the highway under the weather conditions then obtaining could not have seen the standard crossing signal, the jury might have concluded that this made it all the more necessary that reflectors or effective light signals also should have been provided. The jury might also have concluded that the standard crossing signal, because of its well known warning purpose, would have attracted the attention of the driver although the rectangular sign was not observed by him.

The plaintiff also asserts that the evidence was sufficient to submit to the jury the question whether there was adequate warning of the approach of the train to the cross-

ing by means of sounding the locomotive whistle and the ringing of the bell. The only evidence of any probative value on this question in support of the plaintiff's position is the testimony of the driver of the truck that he did not hear the whistle or bell. Since he did not know he was approaching a railroad crossing, he was evidently not listening for these crossing signals. If he heard the whistle before becoming aware of the crossing he might have thought it was blowing for a crossing on another highway and paid no attention to it. The testimony of the engineer and the conductor, and also of a traveler on the highway, was very positive that these signals were given, and the contrary evidence in the record is not sufficient to raise an issue of fact which would justify its submission to the jury.

The plaintiff invokes paragraph 2 of section 3885 of the Code as imposing a duty on the railroad with respect to the installation of crossing signals. This section prescribes the proceedings and conditions to be complied with by a railroad company in order to entitle it to construct its line across a State or county road at grade. The provision relied on is that "Such crossing shall be supported by such permanent and proper structures and fixtures, and shall be controlled by such customary and approved appliances, methods, and regulations as will best secure the safe passage and transportation of persons and property at and along the State or county road along the line of the public service corporation, and will not be injurious to the highway to be crossed, * * * ."

The provision makes no reference to warning signals, these being specifically dealt with by the other sections we have referred to. The language quoted is very general and must be considered as directed to safety measures other than highway warning lights and signs.

The defendant insists that the evidence shows that the driver of plaintiff's truck was guilty of contributory negligence as a matter of law. It is first claimed that the driver should have seen the rectangular sign maintained by

the defendant along the side of the highway. The testimony shows, however, that it was misty and foggy, and that the driver's view was for this reason indistinct and obscure. There was nothing about the shape of the sign which would arrest his attention. It is possible that he actually saw the sign but was unable to read the words placed thereon, did not regard it as a crossing warning, paid no attention to it, and did not remember seeing it. The absence of the customary crossing signboards which are required by statute might have misled the driver. into believing that a railroad crossing at that point did not exist. In other words, the fact that there were no such signals might have been construed to mean there was no railroad crossing at that place.

It is also argued that the driver was negligent in not seeing and heeding the semaphore signal light. There was substantial testimony, however, that this light was placed so high that it was very difficult to see even on a clear night, and much more so on a misty or foggy one.

A photograph was introduced in evidence showing a painting on the surface of the pavement of a warning in the shape of a cross and the letters "R. R." The photograph shows this sign to be white and clearly visible. The county officer, however, who was present on the scene of the accident shortly after its occurrence testified that this sign as shown in the photograph was recently painted by the highway department, and that at the time of the accident the sign formerly painted by the department had been rubbed out by traffic and was not visible under the weather conditions at that time. Another small circular sign was maintained by the highway department. It was placed on a post alongside a hedge near the road. We cannot say that the driver was negligent in failing to see same or appreciate its significance under the prevailing weather conditions and in the absence of the customary crossing signboards. There was also evidence that the hedge along the driver's right side of the highway obstructed the view of the approaching train.

It is further claimed by the defendant that the action of

the driver of the truck, after he discovered the existence of the crossing, constituted contributory negligence. His testimony was to the effect that he was driving at a speed of about twenty-five or thirty miles an hour, and that the first knowledge or intimation he had that there was a railroad crossing ahead of him was when he saw the rails of the track about twenty, twenty-five, or thirty, feet away. He immediately slowed down his truck and looked first to the left, as was his custom at railroad crossings, and saw nothing approaching from that side. He then turned his head to the right and saw the headlights of defendant's approaching train. At that time his truck was already on the southbound track and was traveling about eight or ten miles an hour. The driver did not know on which track the train was traveling, nor could he accurately estimate the distance or speed of the train. Rather than stop on either track, he speeded up his motor and succeeded in clearing the southbound track with his tractor before the locomotive struck the trailer about its middle and carried half of it up the track.

We do not think it can be said that his action in slowing down his vehicle and looking to the left and then the right constituted contributory negligence as a matter of law. Moreover, if the driver, without any fault on his part and in ignorance of the existence of the crossing, suddenly found himself and his vehicle within about twenty feet of the rails, the jury would have been justified in concluding that he was not lacking in the exercise of ordinary care in getting on the southbound track before discovering the approaching locomotive. After such discovery, the driver was in a position of extreme peril and had no time to deliberate as to what his choice of action should be. The truck was a very heavy vehicle, the tractor and trailer weighing 21,000 pounds, and was transporting a load of household goods weighing seven or eight thousand pounds. It cannot be said as a matter of law that, if the driver had tried to stop the vehicle after discovering the approaching train, he would have succeeded in stopping it before reaching the north-

bound track, or even that the action which he did take for the protection of his own life was not the wisest or safest under the circumstances.

The duty of a traveler to look and listen for an approaching train *when he knows of the existence of the crossing* is very different from that of the traveler who is *ignorant of its existence.* The distinction was clearly expressed in the opinion of the Circuit Court of Appeals in *Stephenson* v. *Grand Trunk Western R. Co.,* 110 F. (2d) 401, 132 A. L. R. 455, at page 467, in the following language:

" * * * Without minimizing what often has been said regarding the duty of a person approaching a railroad crossing, to employ all of his senses for the purpose of ascertaining whether or not it is safe to cross, we do not believe such duty exists until he has knowledge, or by the exercise of reasonable care, should have had knowledge that there is, in fact, a crossing. Otherwise, a person traveling upon a highway would be under a continuous duty to look and listen for a train regardless of where he was with reference to a railroad crossing."

The defendant insists that the verdict of the jury on its cross-claim should be considered as conclusive of the merits of the whole case. The verdict, however, was rendered after the jury had been instructed that the plaintiff's claim to damages was without merit. This was obviously prejudicial to the interests of the plaintiff on the issues submitted on the cross-claim.

The judgment of the hustings court is reversed and the case is remanded for a new trial not inconsistent with the views herein expressed.

*Reversed and remanded.*

SPRATLEY, J., dissenting.

I am unable to concur in the reasoning and conclusion of the majority in this case.

Under the facts, it seems to me to be immaterial whether

a signal board in the form of an X or cross, containing the inscription "Railroad Crossing," was placed on the highway by the railway company. The admissions of the driver of the truck established his negligence as a matter of law. His failure to observe and keep a proper lookout shows that there was no causal connection between the failure to maintain a signal of crossed boards and the collision of the railway train with the truck.

It appears from the testimony of the driver of the tractor-trailer that he was approaching a large city on a foggy night, with his lights on the low beam. The lights were not sufficient to show up an object at least two hundred feet away as required by the statute. He had at least twice before travelled this route. Proceeding at a rate of about twenty-five or thirty miles an hour, he first saw the track rails when he was thirty feet away from them. He then slowed down his speed, shifted to low gear, and continued forward without looking to his right or left when looking would have been effective. As he proceeded across the rails he "happened to glance up and down the tracks," and saw the "flasher on the locomotive." Under the existing physical conditions, he could have seen it much earlier had he kept a proper lookout. It is also clear that he could have seen the warning signs placed by the railway company if he had been keeping a proper lookout, because he admits that his lights were sufficient to disclose them. Notwithstanding the presence of a medium fog, he failed to exercise caution commensurate with the circumstances.

I concur with the opinion of the learned trial judge, who saw and heard the witnesses testify, that the truck driver was clearly negligent. The circumstances justified the finding by the jury that his negligence was the sole proximate cause of the collision. The judgment should be affirmed.