# Richmond

ROY L. SYKES, ADMINISTRATOR OF THE ESTATE OF DELORES BLY ELLIS
V. NORFOLK AND WESTERN RAILWAY COMPANY, A CORPORATION, AND
H. W. KNIGHT.

January 26, 1959.

Record No. 4814.

Present, All the Justices.

The opinion states the case.

Henry E. Howell (*Guy E. Daugherty; Jett, Sykes & Howell*, on brief), for the plaintiff in error.

*Thomas R. McNamara* (*Leigh D. Williams; Williams, Cocke, Worrell & Kelly*, on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

This action for damages was brought by the administrator of Mrs. Delores Bly Ellis, who was killed in the crossing accident involved in the case of Roy L. Sykes, Administrator of Mrs. Lucille Rhodes, No. 4813, decided today, *ante* p. 541. The latter case was tried in March and the present case in May 1957. In the first case the jury found for the plaintiff and on defendants' appeal we reversed the judgment and entered final judgment for defendants. In the present case a different jury found for the defendants and from the judgment confirming their verdict the plaintiff now appeals and assigns error with respect to the giving and refusing of instructions and the admission and rejection of testimony.

In this case, as in No. 4813, the court instructed the jury that the evidence was uncontradicted that the whistle was blown and the bell was rung as required by statute; that the signal device was working and that if the jury believed from the evidence that the wigwag signals at the crossing were "reasonably adequate to avoid injuring persons who were exercising reasonable care for their own safety," they should find for the defendants. In No. 4813 the court submitted to the jury the question of the negligence of the driver of the automobile but in this case instructed the jury that the driver was guilty of negligence as a matter of law and if they believed from the evidence that to be the sole proximate cause of the accident they should find for the defendants.

On this trial the same witnesses as in No. 4813 testified for the plaintiff and for the defendants and gave substantially the same testimony, with the exceptions hereinafter stated. As appears from that opinion, Mrs. Ellis was killed when the automobile in which she and others were riding was struck by the Norfolk and Western Railway Company's passenger train known as the "Powhatan

Arrow," at a crossing of U. S. Highway 17 in Norfolk County near the City of Portsmouth at about 11:20 on the night of January 2, 1956. The car was traveling south and the train was running east. The situation of the crossing and its surroundings, the weather conditions prevailing on the night of the accident, the signals from the train and at the crossing are described in the opinion in No. 4813, *ante*.

The additional evidence on the present trial was as follows:

State Trooper Davis, a witness in No. 4813, said it was a cold, damp, foggy night, so extremely foggy that he could hardly drive above 20 or 25 miles an hour, and in spots it was impossible to see. As he approached the crossing from the north shortly after the accident the first thing he could see at the crossing was a blur of red lights flashing from a fire truck when he was approximately 50 feet from the crossing. He said the wigwag signal at the crossing had "a small red light in the center of it and a bell;" that if you were driving with windows up you would have to be within 50 feet at least before you could hear the bell, and with windows down you could probably hear it 100 to 150 feet. He did not see the crossarm signal until he got out of his car and was approximately 50 feet from the crossing. There was "quite a bit of light around it at that time" from the numerous cars there with lights on, the fire truck lights and several spotlights being played on the scene. His investigation revealed that Herbert White was driving the car at the time of the accident.

The husband of Mrs. Lucille Rhodes testified that he drove the car from Whiteville, North Carolina, about 270 miles from Norfolk, leaving there about noon and coming by way of U. S. 17. Mrs. Ellis, plaintiff's decedent, was sitting on the right-hand side of the front seat when the car left Norfolk on the return trip.

State Trooper Pace, also a witness in No. 4813, testified that the houses west of the road would block a driver's vision as he traveled south on U. S. 17 and between the last house and the railroad there was some shrubbery which would also tend to obstruct vision to the west. (The row of houses was sitting back 75 feet from Route 17 and 125 feet north of the tracks.) He said that each of the two signal lights at the crossing shines both to the north and to the south so that a driver approaching from the north would see a wigwag light operating on both sides of the road "to his extreme right and to

his extreme left." The one south of the tracks was designed primarily for traffic going north.

Frank A. Smeltzer, not a witness in No. 4813, testified that he was supervisor of signals for the defendant company and had been for ten years; that the crossing involved here was in his jurisdiction; that it was part of his duties to make recommendations with regard to vehicular safeguards at crossings; that there was "right much traffic on the crossing;" that this traffic possibly increased in 1955 compared to 1954, and he recommended that automatic crossing gates and flashers be installed at this crossing. His recommendation was in writing and made to the superintendent of the Norfolk division; that normally it would have gone through the general superintendent and from there possibly to the crossing engineers for study. The present traffic signals were installed in 1941 and had always been kept in good condition; that he had observed them the night before he testified when it was cloudy and dark, and in his opinion they could be seen from the north for about 1600 feet and that he considered them adequate to warn an approaching driver. Asked "Why did you recommend this change in 1954 and 1955?" he replied, "Well, due to the amount of traffic and the crossing gate is a more modern installation than the one we have."

Armistead, civil engineer, also a witness in No. 4813, testified that the map he exhibited showed only the dwelling houses, not any buildings, garages or sheds in the rear; that "there is a certain number of trees in front of these houses, a lot of shrubbery, that kind of thing."

The only additional evidence shedding light on the circumstances of the collision was presented on behalf of defendants in the deposition of Antonio Leo, an eye-witness of the tragedy.

Antonio Leo testified that he was a resident of Worcester, Massachusetts, "an install and repairman" for New England Telephone & Telegraph Company, and that on the night of January 2, 1956, at about 11:30 p. m., he was returning from a vacation in Florida to his home in Massachusetts. He said that as he approached the crossing in question from the south, the first thing he saw was the wigwag red signal; that "It was a red light and it was swinging off and on." He said that he could not give a good estimate because it was foggy, a rolling type fog that "you'd hit thick spots and light spots;" but that he thought he was approximately 50 or 100 feet from the crossing when he saw the signal lights; that he would say it was less than 5

seconds from the time he first saw the lights until he stopped "because I had to get on the brakes awfully quick to stop;" that he stopped approximately 20 or 25 feet from the crossing, and he then looked to his left and saw the headlights of the train approaching out of the fog. After he stopped he heard the warning bells at the crossing and they were "fairly loud. I heard it O. K." He did not recall hearing the train whistle "until it was right into the crossing." His windows were closed except the vent on his left side was open a little bit and his radio was on low volume. He was unable to estimate the distance the train was from the crossing when he first saw it; but he would say that from the time he stopped until the train struck the car, it was approximately 10 or 15 seconds. He described the collision as follows:

"While I was at a standstill watching the train come out of the fog, and the movement of the light out of my right eye, there was a car coming in the opposite direction and it come right on across the tracks. Evidently he didn't either see the signal, or on account of the road conditions; I don't know which it was. He come right across the tracks."

Leo further testified that to the best of his knowledge, the oncoming car "made no effort to reduce its speed" and that he was unable to give "a truthful estimate" of its speed. Cross-examination failed to elicit from him an affirmative statement that the whistle was not blown before the train reached the crossing.

The light from Leo's car was the light which the engineer of the train said he saw when the train was at least 1300 feet from the crossing.

Signal maintainer Kitts testified that the light bulb exhibited by the plaintiff was not the type that was in the wigwag signal when he examined it on January 3; that it was smaller in size only and would not be a proper bulb to have in the light; that the bulb he examined had written on it "21 candle power, 12 to 16 volts," which he thought was the proper size to have in there.

Dalton, the fireman, testified that the train was 1000 or 1100 feet from the crossing when he first saw the lights of the car in the vacant spots between the houses going at a moderate speed, he would say, "roughly" 25 miles an hour. The crossing lights were working and he assumed the car would stop so he looked for his block signal "a good little ways past the crossing" and when he glanced back at the highway this car had gathered speed and had already started

on the crossing. He could see the glare of the wigwag signals shortly after the train got to the whistle board. After the train stopped he could see reflections from white and red lights as of automobiles back toward the crossing, a good half a mile away. On cross-examination he said that after looking for his block signal the next time he saw the automobile it was approaching the first rail of the westbound track and just about ready to go on the first rail when the train was probably something like 30 to 40 feet away.

B. A. Grubbs, assistant safety superintendent of the defendant company, not a witness in No. 4813, testified that since these signals were installed in 1941 there had been only one nighttime accident at this crossing and on cross-examination he stated that there had been four in the daytime. He did not recall that the safety department had made a traffic study of this crossing or of the vehicular safeguards there.

James M. Hesser, not a witness in No. 4813, testified that he was assistant superintendent of signals and communications for the defendant company; that a light bulb rated at 21 candle power would give 21 times as much light as a standard candle and that a reflector behind it concentrates the light, the degree depending on the efficiency of the reflector, but 100 times would not be unusual. He explained that a watt is a unit of energy; that the bulb which the witness Kitts had testified was in the signal was rated by the manufacturer as a 12 to 16-volt bulb, 21 candle power, and that the illumination from it would be practically the same as that of the bulb exhibited in evidence. He stated that he had observed the crossing signal from the north a night or two before the trial and was able to see it plainly for a distance of about 1000 feet. It was generally conceded, he said, that a lamp decreases in intensity as it ages.

The defendants were permitted to demonstrate to the jury in the court room the operation of a signal device of the same type.

■ Plaintiff's assignments of error, in addition to those with respect to the giving and refusing of instructions, include several relating to the admission and rejection of testimony, as follows:

(1) To allowing defendants to introduce testimony as to the number of accidents that had previously happened at this crossing. In *Sanitary Grocery Co.* v. *Steinbrecher*, 183 Va. 495, 500, 32 S. E. 2d 685, 687, it was pointed out that the admissibility of such testimony is a question on which courts have disagreed, but we said: "In Virginia, however, from the cases cited above, we are committed to the

proposition that evidence of the absence of other injuries is not admissible when timely objection is interposed to it."

We have no disposition to depart from the rule stated in the *Steinbrecher* case and it would be applicable here except for the fact that the plaintiff had introduced the testimony of the defendant company's supervisor of signals that he had recommended to his company that it install automatic crossing gates and flashers at this crossing. This, the plaintiff says, was to prove that notice of the inadequacy of the signals had been brought home to the defendant company. We hold that it then became permissible for the defendants to introduce the accident experience at the crossing to rebut the inference of negligence that might be made from the failure to follow this recommendation.

■ (2) To excluding testimony to show the customary and usual type of crossing signals in the area involved. The evidence offered related to the type of signals used by the defendant company at other crossings in this area. Under some circumstances such evidence has been received but on the issue here it was properly excluded.

"* * * The need of such protection at a given crossing depends upon the special features and facts connected with it. * * * It follows that what is needed at one crossing has no relevant bearing on what is needed at another. The details of each situation are too numerous to admit of fair comparison, and it may not be said that, because there is special protection at one crossing, there should be at another, even when it appears that the crossings have some special features in common. Even assuming that comparison would have some relevancy of bearing, yet to permit it would mean a frequent if not usual investigation into the special features of the crossing or crossings with which comparison is made, and would result in an impractical and confusing multiplicity of collateral issues, tending to defeat rather than aid justice." *Stocker* v. *Boston & M. R. R.*, 83 N. H. 401, 143 A. 68, 71. See also *Seaboard Air Line Ry. Co.* v. *Watson*, 94 Fla. 571, 113 So. 716; 65 C. J. S., Negligence, § 232, at p. 1049; 38 Am. Jur., Negligence, § 317, p. 1015; Anno. 137 A. L. R. 611.

*Southern R. Co.* v. *Blanford*, 105 Va. 373, 54 S. E. 1, relied on by plaintiff is not controlling. The question there was whether the defendant should have maintained switch lights where none had been installed and the disputed evidence was introduced not for

the purpose of comparison but rather to show that the defendant was familiar with their use. Cf. *Southern Ry. Co.* v. *Mauzy*, 98 Va. 692, 694, 37 S. E. 285, 286; *Norfolk & W. Ry. Co.* v. *Bell*, 104 Va. 836, 839, 52 S. E. 700, 701.

(3) To excluding the testimony of J. C. Bullock, Jr., employed in the traffic and planning division of the State Highway Department, relating to a study of the number of trains and the number of vehicles using this crossing, from which he figured an "accident exposure index," and concluded that this was "a relatively hazardous crossing." He had not seen the crossing himself and his calculations were made with figures furnished by others and not under his supervision. His testimony was properly excluded.

■ (4) To permitting "defendants to demonstrate a brand new signal light in the vacuum of the court room." Plaintiff's complaint is that this was a signal device differing in condition from the one at the crossing and exhibited in a situation unlike that existing at the time of the accident; and the lights were turned off in the court room and the signal lighted up at eye level before the jurors. It would have been better had the demonstration been limited to an unlighted signal, 20 Am. Jur., Evidence, § 756, page 628. However, the jury could have well made proper allowance for the difference in conditions and situations and, under the facts of this case as a whole, we think that the demonstration, as conducted, was at most harmless error.

■ In view of our conclusion, we need consider only those assignments of error relating to the granting and refusing of instructions which deal with the issues whether the defendants were guilty of negligence in failing to provide adequate warning signals at the crossing, whether the driver of the car was guilty of negligence as a matter of law, and whether such negligence was the sole proximate cause of the accident.

A consideration of the material and pertinent evidence furnishes the answer.

In addition to other evidence, we have the affirmative testimony of three eye-witnesses in this case. The testimony of each of the three, H. W. Knight, the engineer of the train, William E. Dalton, the fireman, and Antonio Leo, a disinterested party, is postive, credible, and uncontradicted. Neither of them has been impeached, and their testimony cannot be properly disregarded. *Messer* v. *Common-*

*wealth,* 145 Va. 838, 845, 133 S. E. 761; *Worsham* v. *Commonwealth,* 184 Va. 192, 194, 34 S. E. 2d 234.

Antonio Leo viewed the accident as it were from a ringside seat. He relates in clear and vivid language how the tragedy occurred. His testimony provides additional proof that the warnings and signals given of the approach of the train were reasonably adequate to give notice to persons exercising reasonable care for their own safety. The driver of the automobile had as good an opportunity to see and hear the warnings as did Leo. Moreover, James B. Carey and William L. McCoy, operators of automobiles approaching the crossing from the same direction as the driver of the car, at the time of the accident, had the same view as did the driver of decedent's car, and they respectively saw the warning lights at distances of 50 and 75 to 100 yards north of the crossing. Despite the wigwag lights, the sounding of the gong, the whistle of the train, the ringing of its bell, and the headlights of the approaching train, the driver of the automobile drove upon the tracks immediately in front of the train. He was the only one of the operators of four automobiles approaching the crossing, near the same time, who failed to heed the multiple warnings by coming to a stop or turning into a side road. The undisputed facts convict the driver of plaintiff's automobile of negligence as a matter of law. He utterly failed to exercise care commensurate with the hazards which the attendant circumstances imposed on him.

We conclude that the trial court correctly submitted to the jury the issue whether the signals at the crossing were adequate. It properly instructed the jury that the driver of the car was negligent as a matter of law. However, it left to the determination of the jury whether such negligence was the sole proximate cause of the collision, and the jury so found. There is ample evidence to support their finding. Indeed, that was the only proper finding that they could have made.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*

BUCHANAN, MILLER and SNEAD, JJ., dissenting.

BUCHANAN, J.:

The majority opinion holds that the trial court correctly submitted

to the jury the issue whether the signals at the crossing were adequate, and properly instructed the jury that the driver of the car was negligent as a matter of law. We dissent from the proposition that the driver of the automobile was negligent as a matter of law. In our judgment the question of the driver's negligence should have been submitted to the jury in this case, as it was in No. 4813, *ante*, and it was reversible error for the court to decide that question.

To hold that the driver was negligent as a matter of law is inconsistent with the holding that the negligence of the defendants was a question of fact to be decided by the jury. If as a matter of fact the warning signals were not adequate, they were so because they did not give adequate warning of the approaching train under the existing conditions; and if the driver was not adequately warned then he should not be held guilty of negligence as a matter of law for failing to see or hear an inadequate warning. While the negligence of the driver was not imputable to the plaintiff's decedent, yet the instruction that the driver was negligent as a matter of law was bound to have affected the conclusion of the jury on the question of the negligence of the defendants, interrelated as the two questions were.

Not only were the two instructions inconsistent, but it was also wrong under the evidence to tell the jury that the driver of the automobile was guilty of negligence as a matter of law. As we pointed out in our dissent in No. 4813, this could be so only if reasonable men could not differ as to what was proved by the evidence and the reasonable inferences from the evidence. In our opinion the evidence in this case, even more strongly than the evidence in No. 4813, makes the question of the negligence of the driver of the automobile, as well as the negligence of the Railway Company, one that should be decided by the jury and not by the court.

We shall not repeat here the discussion of the evidence in No. 4813. As stated in the majority opinion, the evidence in this case was the same as the evidence in that, with certain additions. We note the following features of the additional evidence in the present case not included in the majority opinion:

State Trooper Davis testified that the crossing was slightly higher than the roadway and in order to see the signals you have to look up instead of straight ahead. He said that the situation of the houses north of the crossing and west of the road required the motorist to come to a very slow speed to get a good view of eastbound trains,

and in his seven years' experience in patrolling this crossing he would approach it with extra caution at any time.

State Trooper Pace said he was familiar with the crossing and exercised more caution at it than at others because of its nature. He also pointed out that on the south side of the crossing there were open fields on each side of the road.

Leo, who stopped his car on the south side of the track, testified that he was a licensed airplane pilot. He said he jammed on his brakes the very moment he saw the signal light and stopped 20 or 25 feet from the crossing. He said that just one signal red light was all that he saw and that it "was a rather small red light." He said that the road was wet and the fog was dense at the crossing when he stopped and that the only thing he could see of the train as he approached was the headlight. He said that the automobile did not change its course or reduce its speed; that the train struck it on the right rear approximately at the gas tank and the car exploded.

Thus it is that in this case in addition to the evidence in No. 4813 we have these important facts with respect to the adequacy of the wigwag signal: (1) The Railway Company's supervisor of signals, whose jurisdiction included this crossing, testified that the wigwag signals at the crossing were installed in 1941, fifteen years before this accident happened; that traffic had increased since then; that due to the amount of traffic and the more modern character of the installation (and hence the safer as the jury could conclude) he had recommended in 1954 and 1955 that automatic crossing gates and flashers be installed at this crossing; and (2) that the wigwag signal was the only sign or signal that apprised defendants' witness Leo, who approached the crossing from the south, where there were no obstructions to his view, that he was near a railroad track and that a train was coming; that this wigwag signal was of such type that he was within 50 to 100 feet of the crossing before he saw it, and by jamming on his brakes the very moment he saw it he was able to stop at 20 to 25 feet from the crossing.

In the face of these facts, and from the evidence of the State Troopers, the police officers and others, as to the character of this crossing and how close it was necessary to be to it on that night even to see a burning automobile, it is beyond us to understand how it may properly be said that there was no negligence on the part of the Railway Company that had anything to do with this accident

and that as a matter of law the sole cause of this accident was the negligence of the driver of the automobile.

The jury could reasonably conclude from the evidence in this case that the driver of this automobile did not know this crossing was there; that he could not see the crossarm signal any sooner than did Trooper Davis, who had the aid of the lights from the burning automobile and other vehicles and still could not see it until he was within 50 feet of the crossing. The jury could conclude that the driver had no reason to look between the houses as he approached a crossing he did not know was there; that even if he saw the headlight through the fog after he passed the houses, he would not immediately realize it signaled the approach of a train on a track he had not seen. The jury could further conclude that if and when the driver saw the "rather small light" which was the only thing that caused the witness Leo to stop, he could have been closer to the crossing than the 50 to 100 feet from which Leo saw the crossing signal; or that his reflexes and reaction were not as quick as those of Leo, who had to "get on the brakes awfully quickly" and stopped within 20 or 25 feet of the tracks. If he was going 25 miles an hour, as the fireman thought when he saw his lights between the houses, it would have required more than the 59 feet specified by Code § 46-212.2 (now § 46.1-195, Acts 1958, ch. 541 at p. 732) for him to have stopped on the wet road with four passengers in the car. The jury could conclude that the first notice the driver had of the presence of the crossing and the approach of a train was from the crossing signal, which was inadequate to give him timely warning, and that if he had then tried to stop he might or might not have avoided the collision. He would not be responsible for a mistake of judgment and a failure to act with wisdom and promptness in the emergency if he was not at fault. *Perlin* v. *Chappell*, 198 Va. 861, 866, 96 S. E. 2d 805, 809; *Ivory Storage Co.* v. *A.C.L.R. Co.*, 187 Va. 857, 873, 48 S. E. 2d 242, 251.

The fact that he got into a position of danger "is not conclusive evidence that he was there by his own negligence. He may have been there in consequence of the defendants' negligence, and because he was misled by it." *Kimball & Fink* v. *Friend*, 95 Va. 125, 138, 27 S. E. 901, 903; *Norfolk & Portsmouth Belt Line R. Co.* v. *Freeman*, 192 Va. 400, 408, 64 S. E. 2d 732, 736.

We pointed out in our dissent in No. 4813 the error in the statement, appearing again in the majority opinion in the present

case, that this driver was the only one of the operators of four automobiles approaching the crossing "who failed to heed the multiple warnings." Leo was the only driver who stopped because of the signals. McCoy and Carey stopped because they saw the train on the crossing. Nobody testified as to when or why the Buick stopped.

It is our opinion that this case should be reversed and remanded for a new trial because of the error in instructing the jury that the driver was guilty of negligence as a matter of law.