**Barbara G. CHANDLER, Plaintiff,**

v.

**The NATIONAL RAILROAD PASSENGER CORPORATION, et al., Defendants.**

Civ. A. No. 4:94cv74.

United States District Court, E.D. Virginia, Newport News Division.

March 27, 1995.

---

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Among the several issues in this action is the question whether Virginia Code §§ 56–405.3 and 56–406.1 alter the common law duty of railroads to place appropriate protective devices at especially hazardous crossings. For the reasons set forth below, the court concludes that the statutes do not relieve railroads of their common-law duty to identify especially hazardous railroad crossings and to erect and maintain protective devices at such crossings.

■ In Virginia, the common law remains in force except where it is changed by statutory or constitutional law. Va.Code § 1–10. Moreover, legislative intent to change the common law must be "clear," see *Hill v. Nicodemus*, 979 F.2d 987, 990 (4th Cir.1992); or "plainly manifested," see *Griffith v. Raven Red Ash Coal Co.*, 179 Va. 790, 20 S.E.2d 530, 533 (1942).

■ The common law places upon railroads the responsibility for making railroad crossings safe. This includes the obligation to discover crossings that are especially, extraordinarily, or extra-hazardous and to make them reasonably safe by erecting lights or other protective devices there. See *Bangley v. The Virginian Ry. Co.*, 195 Va. 340, 78 S.E.2d 696, 700 (1953); *John F. Ivory Storage Co. v. Atlantic Coast Line R.R. Co.*, 187 Va. 857, 48 S.E.2d 242, 248–49 (1948); *Atlantic Coast Line R.R. Co. v. Clements*, 184 Va. 656, 36 S.E.2d 553, 558–59 (1946).

■ The railroad defendants base their position on two statutes which in pertinent part provide:

When required by the State Highway and Transportation Commissioner or by the governing body of any county, city or town, every railroad company shall cause a grade crossing protective device including flashing electric lights approved by the Department of Highways and Transporta-

James M. Boyd, Boyd & Boyd, James D. Crutchfield, Evans & Co., Norfolk, VA, for plaintiff Barbara G. Chandler.

David C. Bowen, Stephen R. Jackson, Willcox & Savage, Norfolk, VA, for The Nat. R.R. Passenger Corp. d/b/a AMTRAK and CSX Transp.

tion and the State Corporation Commission at such heights as to be easily seen by travelers, and not obstructing travel, to be placed, and constantly maintained, at each state highway at or near each place where it is crossed by the railroad at the same level. Such device shall be automatically activated by the approaching train so as to be clearly discernible to travelers approaching the railroad crossing from each direction at a distance of 200' away. Such lights shall be erected at the initiative of counties, cities or towns only when required by ordinance or resolution adopted by the governing body thereof stating that such political subdivision will pay the initial installation cost of such lights and that such cost and maintenance costs will be fixed as provided by this article...,

Va.Code § 56–405.3; and,

... [W]henever in the opinion of the council of any city or incorporated town the public interest requires that automatically operated gates, wigwag signals or other electric or automatic protection devices or manually operated gates be installed or a flagman stationed and kept at any highway or street crossing of one or more railroads at grade within the corporate limits of such city or incorporated town, the State Highway and Transportation Commissioner, or the governing body of such county, or the council of such city or incorporated town, as the case may be, may agree with the railroad company or companies involved, on such terms and conditions as such Commissioner, governing body or council shall deem in the best interest of the public, regarding the plans and specifications, the method and manner of construction and operation, and the division of the cost of installing such crossing protection devices...,

Va.Code § 56–406.1. These provisions and the administrative actions implementing them, according to the railroad defendants, have vested in the Commonwealth Transportation Board ("Board") and in local governing bodies authority to require a railroad to install at particular crossings certain flashing electric lights and other protective devices. This means, according to the defendants,

that, under Virginia law, these governmental entities now bear the exclusive burden of determining the need for such devices.

The statutory language, however, does not manifest a clear intent to change the common-law rules expressed in *Bangley, Ivory Storage* and *Clements*. The statutes, of course, articulate concurrent obligations, but in so doing, the language does not eradicate the long-standing, independent, common-law duty imposed on railroads. Instead, their focus is on granting to certain governmental bodies authority to initiate a procedure for making railroad crossings safer in the "public interest" and for allocating costs between the railroad and government when the changes are required by the government.

The statutes on which the railroads rely do not differ significantly from their predecessors. For example, citing Va.Code § 3998 (Michie 1942), *Clements* observed: "A town may, when its council determines it to be in the public interest, require a railroad company to erect and maintain a gate or keep a flagman stationed at any place where its tracks cross a street within its corporate limits." *Clements*, 36 S.E.2d at 558. Clarifying the relationship between the statutory duty and the common-law duty, the Supreme Court of Virginia went on to say that "[i]n the absence of a statute or an ordinance, the protection required at the ... crossing was a question of fact dependent upon the conditions existing there." *Id.* In *Ivory Storage*, the court noted that Va.Code § 3985 (Michie 1942) provided "lights or reflectors ... shall be placed and maintained by the railroads at State highway crossings when ordered to do so by the State Corporation Commission ['SCC']." *Ivory Storage*, 48 S.E.2d at 247. Notwithstanding the absence of an SCC order in that case, the court found that an independent common-law duty remained with the railroad. *See id.* 48 S.E.2d at 248, 249 ("The defendant contends that the fact that the [SCC] did not order it to install a different type of light should itself be considered as conclusive evidence that the light it maintained was an adequate warning to travelers. We cannot agree.").

The only decision cited by the defendant railroads is *Duncan v. Union Pacific R. Co.*,

842 P.2d 832 (Utah 1992), wherein a statute conferred upon the Utah Department of Transportation ("UDOT") the authority "to determine at which crossings automatic warning lights and gates shall be installed and maintained." *Id.* at 833. There, the plaintiffs conceded, and the majority of the court agreed without explanation, that, by giving the UDOT authority to make this determination, the statute placed *exclusive* responsibility with UDOT, relieving the railroad of its duty to make an independent determination of the need for warning devices. *Id.* The language of the Utah statute does not manifest an intent to relieve the railroad of its common-law duties and, as the dissent in *Duncan* persuasively observed, "[t]he fact that one party has a duty ... does not preclude another party from having a concurrent duty." *Id.* at 841. This logic is especially compelling in Virginia where a clear legislative intent is required before a common-law duty will be discarded.

▪ The defendants place significant reliance on the Manual on Uniform Traffic Control Devices ("MUTCD"), the 1988 edition of which was adopted by the Board as the "standard for all highways under the jurisdiction of the Virginia Department of Transportation." *See* Defendants' Ex. 3. Part VIII of this manual, entitled "Traffic Control Systems for Railroad—Highway Grade Crossings," describes in § 8A–1 some general principles that speak to the roles of a highway agency and a railroad:

> With due regard for safety and for the integrity of operations by highway and railroad users, the highway agency and the railroad company are entitled to jointly occupy the right-of-way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein.

If this were a Virginia Code provision and if it were the sole provision on point, it would provide a strong argument that a railroad is relieved of the responsibility to determine the need for and to select traffic-control devices at railroad crossings. But, even in that case, a look at the text as a whole reveals that, under MUTCD, railroads retain a concurrent duty that is circumscribed by MUTCD's obvious concern for uniformity and conformity of traffic-control devices to national standards. This duty includes both identifying especially hazardous crossings and installing appropriate devices, perhaps after conferring with the proper government agencies.

It is important, moreover, to understand the significance of the Board's adoption of MUTCD in light of Virginia's statutory scheme. The powers and duties of the Board are set forth at Va.Code § 33.1–12. The Board's regulatory function is limited to establishing traffic regulations, Va.Code § 33.1–12(3), which are given the "force and effect of law" by Va.Code § 33.1–19. This power was not applicable, nor was it invoked, in the Board's adoption of MUTCD. A more applicable duty is found at Va.Code § 33.1–12(8), which states that one of the Board's duties is "[t]o cooperate with the federal government ... in the taking of measures for the promotion of highway safety, in research activities, [and] in the preparation of standard specifications." The Board also cited, as justification for adopting the MUTCD standards, Va.Code § 46.2–1312, which provides for conformity of traffic signals and markings between those placed by local authorities and those placed by the Virginia Department of Transportation; and Va.Code § 33.1–47, which provides that "all markings and traffic lights installed or erected by towns on the primary roads therein maintained by the Department of Transportation shall first be approved by the [Commonwealth Transportation] Commissioner."

Nothing inherent in the authority invoked by the Board when it adopted MUTCD as a standard suggests that railroads would be relieved of their responsibility to discover especially hazardous crossings and to erect lights and other appropriate protective devices at such crossings. Rather, the adoption

of MUTCD seems to have been aimed principally at setting standards to make highway safety measures implemented by local agencies consistent with those implemented by state agencies. The stated objectives of the Board in adopting MUTCD and the actual substance of MUTCD itself demonstrate that its adoption was intended to maximize safety and uniformity. Neither of these goals demands that railroads no longer bear their common-law responsibility. Uniformity may very well require a railroad to get permission from a government agency for a particular type of signal or other device, but this requirement, if it exists, does not place the *exclusive* responsibility on government agencies for (1) determining the need for, (2) funding, or (3) actually erecting and maintaining protective devices. If a railroad discovers that a crossing is especially hazardous, it must take action to eliminate the hazard whether or not the relevant municipal or state agency cooperates by contributing funds. The appropriate action for the railroad may include installation of lights and gates that conform to the standards adopted by the Board.

Neither the statutes on which the defendants rely nor MUTCD evince a clear legislative intent to abolish the long-standing duty of a railroad to take extra precautions at extra-hazardous crossings. The common-law duty therefore remains.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.